787 So.2d 1158 (2001)
Daniel ABSHIRE, et al.
v.
Addison WILKENSON, et al.
No. 01-0075.
Court of Appeal of Louisiana, Third Circuit.
May 30, 2001.
*1160 Mark Edward Stipe, Perret Doise, Lafayette LA, Counsel for Plaintiff/Appellants Daniel Abshire and Cynthia Abshire.
Philip Stephen Aucoin Jr., Lafayette, LA, Counsel for Defendant/Appellee Allstate Indemnity Company.
James Thomas McManus, Lafayette, LA, Counsel for Defendant/Appellee State Farm Insurance Co., Addison Wilkenson.
Court composed of SYLVIA R. COOKS, OSWALD A. DECUIR, and GLENN B. GREMILLION, Judges.
GREMILLION, Judge.
The plaintiffs, Daniel and Cynthia Abshire, appeal the trial court's judgment based on a jury verdict awarding them a total of $26,230 in damages for injuries suffered by Daniel in an automobile accident. Among other things, the Abshires appeal the awards for general and economic damages. For the following reasons, we affirm as amended.

FACTS
On July 9, 1998, Daniel was traveling southwards along Johnston Street in Lafayette, Louisiana, when he was forced to slam on his brakes due to a left turning car located ahead of his van. As a result, his Ford Mini Van was rear-ended by Addison Wilkenson's Porsche. Daniel, who had a prior history of neck pain and was previously diagnosed with a herniated disc at C5-6, had just left the office of Dr. John Daigle, a chiropractor. Although he did not suffer any pain initially, Daniel became *1161 dizzy shortly thereafter. Upon returning to Dr. Daigle's office a short time later, he complained of neck pain, back spasm, and head ache. As a result of the aggravation of his prior neck problems, Daniel underwent an anterior carpectomy at C5-6, discectomies from C4 through C7, a bone graft, and implementation of an anterior buttress plate.
The Abshires owned and operated Wear Parts, Inc., brokered parts in the earth engaging industry. They had recently borrowed approximately $340,000 in order to begin manufacturing drag shoes for street sweepers. In order to increase their business, they also brought in two employees from out-of-state to help with the manufacture and sales of their products. Due to the downturn in their business, allegedly brought about by Daniel's inability to work, the two key employees, Pat Shalton and Donald Villasenor, sought employment elsewhere. In July 1999, the Abshires were forced to sign their property and equipment over to the Bank of Gueydan (Bank). They agreed to lease the property and equipment from the Bank and continued their business as Gueydan Manufacturing.
On February 1, 1999, the Abshires filed suit against Wilkenson and his insurer, State Farm Mutual Automobile Insurance Company (collectively referred to as State Farm), and their own insurer, Allstate Indemnity Company, seeking damages as a result of this accident. Allstate answered requesting a jury trial and filed a cross claim against State Farm. Thereafter, the Abshires filed a First Supplemental and Amending Petition alleging that the amount of damages they sustained exceeded the limits of the policies issued by both State Farm and Allstate. State Farm answered and filed a Declinatory Exception alleging improper venue. The Abshires then filed a motion for summary judgment on the issue of liability. The trial court granted the motion for summary judgment on December 20, 1999, after which an amended judgment was granted on February 23, 2000.
Prior to the jury trial, the Abshires filed a Motion in Limine seeking to prohibit the testimony of Sara Roberts, a certified public accountant, and Dr. Stan Foster, a neurosurgeon, who examined Daniel at State Farm's request. State Farm filed a motion to exclude the testimony of Ed Levadnuk. The trial court denied the Abshires' motion and granted in part and denied in part State Farm's motion to exclude Levadnuk's testimony. The trial court held that it would accept Levadnuk's testimony as it pertained to his general knowledge of the tungsten carbide road maintenance equipment industry, but would exclude it as it pertained to projections on the future financial performance of Wear Parts.
Before picking the jury, the trial court granted State Farm's motion to exclude the testimony of Pat Shalton as it pertained to Wear Parts' ability to achieve either a certain market share or a projected sales goal within the earth engaging industry. However, Shalton was qualified as an expert in the area of sales of earth engaging equipment.
Following a jury trial on the issue of damages, the jury rendered a verdict awarding Daniel $5,000 in general damages, $11,250 in lost wages and loss of earning capacity, and $9,980 in past medical expenses. Cynthia was awarded $2,000 for loss of consortium. Prior to the May 11, 2000 judgment, the Abshires filed a Motion for Judgment Notwithstanding the Verdict or in the alternative a Motion for New Trial, which was denied. This appeal followed.

ISSUES
The Abshires raise seven assignments of error on appeal:

*1162 1) The trial court erred in limiting Shalton's and Levadnuk's testimony concerning the feasibility of Wear Parts' business plan when he was admitted as an expert in the field.
2) The trial court erred by not charging the jury that the tortfeasor and the insurer were solidarily liable.
3) The trial court erred by charging the jury to consider the force of the collision.
4) The jury erred by only awarding Daniel medical expenses up through Dr. DeAraujo's treatment, when both he and Dr. Foster testified that the accident necessitated the surgery.
5) The jury erred in awarding nominal damages to Daniel considering the major surgery he underwent and the resulting complications.
6) The jury erred in awarding Daniel only $11,250 in economic damages.

EXPERT TESTIMONY
In their first two assignments of error, the Abshires argue that the trial court erred in limiting the testimonies of both Shalton and Levadnuk concerning the feasibility of Wear Parts' business plan. Shalton was admitted as an expert in the sale of earth engaging equipment, while Levadnuk was admitted as an expert in the tungsten carbide road maintenance equipment industry.
La.Code Evid. art. 702 provides:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
"A trial judge has wide discretion in determining whether to allow a witness to testify as an expert, and his judgment will not be disturbed by an appellate court unless it is clearly erroneous." Mistich v. Volkswagen of Germany, Inc., 95-0939, p. 8 (La.1/29/96); 666 So.2d 1073, 1079. This includes the determination of "how much and what kind of education and/or training adequately qualify an individual as an expert." Darbonne v. Wal-Mart Stores, Inc., 00-551, p. 7 (La.App. 3 Cir. 11/2/00); 774 So.2d 1022, 1027.
Shalton had seventeen years of experience in the earth engaging industry. He worked with Daniel at Carbide Products Limited (CPL) and for Bucyrus Blades after it bought out CPL. He testified that he was Bucyrus Blade's "carbide expert" teaching its distributors about carbide products and their use. Shalton was hired by Daniel as Wear Parts' national sales manager and was responsible for acquiring accounts, setting up distributorships throughout the country, and servicing the end users of their products. He had no involvement with Wear Parts' bookkeeping, although he did keep track of the sales and margin on the sales during the last four to five months he worked for Wear Parts.
Levadnuk graduated with a math degree and then worked approximately fifteen years for Kennametal, a company specializing in tungsten carbide products. During the last seven years of his employment with Kennametal, he worked in the road maintenance business, producing tungsten carbide snowplow blades, street sweeper skids, shoes, and other components. Levadnuk next worked for Corning Glass Works, specializing in the development of new businesses for advanced ceramic materials. After Corning sold its advanced ceramics division to a German company, DDA, he stated that he worked for DDA seven years before transferring to the Saint-Gobain Corporation. Levadnuk testified *1163 that he is currently specializing in advanced materials and advanced applications focusing on the medical field.
Levadnuk testified that he performed consulting work in the road maintenance field while working for Corning. He stated that he worked as a direct consultant for CPL more than ten years until the company was sold to Bucyrus Blades. He continues to do consulting work with various companies from a marketing and sales standpoint. Levadnuk testified that he has never been qualified or offered as an expert in a court of law.
In limiting Levadnuk's testimony, the order granting in part State Farm's Motion in Limine stated, "The court will accept the testimony of plaintiff's expert Ed Levadnuk as it pertains to his general knowledge of the tungsten carbide road maintenance equipment industry. The court will exclude any testimony by Mr. Levadnuk regarding projections on the future financial performance of Wear Parts, Inc." The trial court accepted Shalton as an expert in the sales of earth engaging equipment, but denied the Abshires' request to reconsider its decision to strike those portions of his deposition pertaining to projections on Wear Parts' future financial performance.
After reviewing Shalton and Levadnuk's credentials, we cannot say that the trial court abused its great discretion in excluding those portions of their depositions dealing with the assessment of Wear Parts' possible future financial performance. Accordingly, these two assignments of error are dismissed as being without merit.

JURY CHARGES
In their third and fourth assignments of error, the Abshires argue that the trial court erred by failing to charge the jury that the tortfeasor and the insurer are solidarily liable and by charging it that it could consider the force of the collision in reaching its decision. However, since the Abshires failed to object to the trial court's inclusion or failure to include the two jury charges either prior to or immediately after the jury retired to deliberate, they are precluded from raising an objection on appeal. La.Code Civ.P. art. 1793. Accordingly, these two assignments of error shall not be considered.

DAMAGES
In their fifth assignment of error, the Abshires argue that the jury erred in awarding Daniel medical expenses only through his examination by Dr. Luiz DeAraujo, a neurosurgeon, since both he and Dr. Foster testified that the accident resulted in the need for surgery. In their sixth assignment of error, they argue that the jury erred in awarding Daniel only $5,000 in general damages considering the major surgery he underwent and the resulting complications
Dr. William Cenac, an orthopedic surgeon, treated Daniel for neck and shoulder problems in August 1995 and then multiple times between 1995 and June 1998. He last treated Daniel on June 15, 1998. At that time, Daniel's treatment consisted of a gel for muscle spasm relief, muscle relaxers, and pain medication. Dr. Cenac stated that he never discussed surgery with Daniel. He referred Daniel to Dr. Daigle for chiropractic treatment in 1998.
Dr. Daigle first examined Daniel on June 15, 1998. At that time Daniel complained of pain in his head and neck, numbness in his upper extremities that was greater on the left, and spasm in his lower back. He told Dr. Daigle that he previously had this condition five years before, but that his complaints had stopped for approximately two years before *1164 returning. He reported that he was seeking chiropractic care because the medication he was taking interfered with the running of his business. Dr. Daigle diagnosed Daniel as suffering from cervicobrachial syndrome, segmental dysfunction of the spinal joints in his posterior spine, and cervical myofascitis or trigger points in his neck muscles. By the morning of July 9, 1998, conservative treatment had reduced Daniel's complaints to minimal lumbar spasms. When he left Dr. Daigle's office, Daniel had a return visit scheduled for two weeks later.
Shortly after the accident, Daniel returned to Dr. Daigle complaining of neck and lower back pain. When conservative treatment failed to improve his condition, Dr. Daigle referred him to Dr. Roland Miller, an orthopedic surgeon. Dr. Miller had treated Daniel in 1993 and diagnosed him then as suffering from a right-sided herniated disc at C5-6. A September 28, 1998 MRI revealed herniated discs at C4-5, C5-6, and a very small herniated disc at L5-S1. Dr. Miller referred Daniel to Dr. Jack Hurst, a neurosurgeon, for evaluation and treatment and Dr. Joseph Gillespie for pain management.
On October 7, 1998, Dr. Hurst noted no neurological deficits, thus, he recommended that Daniel continue his conservative treatment. His review of the MRI, revealed a moderate focal disc herniation of the right paracentral area of C5-6 and a smaller focal right paracentral disc herniation at C4-5. The MRI also revealed ossification of the posterior longitudinal ligament.
Daniel was next seen by Dr. Stephen Goldware, a neurologist, on October 15, 1998. After examining Daniel and reviewing the MRI, Dr. Goldware felt that he was suffering from a herniated disc at C4-5 and C5-6, central to the right, and a questionable herniated lumbar disc. He further felt that Daniel had a congenitally small spinal canal and that the MRI revealed cervical stenosis from C3 through C7, due to ossification of the posterior longitudinal ligament. Dr. Goldware recommended surgery to correct Daniel's condition.
Daniel was seen by Dr. DeAraujo, a neurosurgeon, for a third surgical opinion on December 2, 1998. Dr. DeAraujo felt that Daniel was suffering from a combination of a herniated disc and changes secondary to arthritis between C4-5 and C5-6 towards the right. He felt that Daniel should undergo surgery from an anterior approach since conservative treatment had not improved his symptoms.
Daniel underwent surgery on January 15, 1999. Dr. Goldware performed an anterior carpectomy at C5-6 with anterior buttress plate instrumentation, which included a discectomy of C4-5, C5-6, and C6-7, and a bone graft. He remained in the hospital for four days before being discharged. Although he initially healed well, he complained of numbness in his left hand on June 8, 1999. On July 6, 1999, Daniel again complained of numbness in his left arm and decreased sensation was noted during examination of the C5-6 and C6-7 disc level on the left. A CT scan of the cervical spine revealed possible movement of the graft, so Dr. Goldware had Daniel wear an external bone stimulator from August 24 through October 14, 1999.
Dr. Stan Foster, an orthopedic surgeon, examined Daniel on April 13, 2000, at the request of State Farm. After reviewing the 1998 MRI, the 1998 myelogram and postmyelogram CT, and physically examining Daniel, Dr. Foster determined that he was suffering from longstanding cervical disc disease, as proven by the ossification of the posterior longitudinal ligament. He further stated that Daniel would probably have required surgery at some point in the *1165 future due to this condition. However, he did state that the Daniel's preexisting condition was aggravated by the 1998 accident.
Both Drs. Miller and Cenac testified that they never recommended surgery to Daniel prior to the 1998 accident. Dr. Daigle stated that Daniel did not have any physical limitations on the morning of July 9, 1998, which would have necessitated the risks involved with surgery. Dr. Hurst testified that he would not have performed surgery on Daniel based solely on his complaints of pain. He stated that ossification is a natural phenomenon of aging and takes at least one year to manifest itself. He went on to note that, if Daniel had ossification of the posterior longitudinal ligament in September 1998, the calcification process had begun long before the accident.
Dr. Goldware testified that the 1998 MRI revealed cervical stenosis from C3 through C7, due to ossification of the posterior longitudinal ligament. He stated that a myelogram and post-myelogram CT revealed severe cervical stenosis extending from C4-5 to C5-6. Although he felt that Daniel had a narrow spinal canal from birth, which had been aggravated by chronic inflammatory problems, Dr. Goldware stated that the accident resulted in an exacerbation of his preexisting condition. He did not believe that Daniel was a candidate for surgery until after the accident. Although he felt that Daniel would eventually have undergone surgery due to the ossification of the posterior longitudinal ligament, there would have been no need for surgery at this time. He believed that Daniel would probably suffer from some level of neck pain for the rest of his life. He stated that Daniel was restricted from heavy lifting, sudden maximum efforts, prolonged repetitive stooping or bending, and long lasting unchanged positions, and was advised to avoid continuos vibrations.
Dr. DeAraujo observed the calcification of the posterior longitudinal ligament and warned Daniel that he would probably undergo surgery from an anterior approach sometime in the future. Although he stated that this had no relationship to the accident and was purely due to the normal aging process, Dr. DeAraujo stated that Daniel's preexisting condition was aggravated by the accident in that it accelerated his symptoms and triggered the need for surgery.
Dr. Gillespie, who specializes in pain management, began treating Daniel in October 1998 for complaints of neck and back pain. He diagnosed him as suffering from degenerative disc disease and sought to rule out a neurocompromise or a pinched nerve. He placed Daniel on conservative treatment consisting of neck traction and oral medications. After undergoing surgery by Dr. Goldware, Daniel returned to Dr. Gillespie in June 1999, complaining of pain along the radial nerve distribution. Dr. Gillespie referred him back to Dr. Goldware. After a June 16, 1999 CT scan, a radiologist questioned whether the bone graft implanted by Dr. Goldware had migrated. The CT scan also revealed mild ventral spondylitic changes at C4-5, with moderate neural foraminal compromise secondary to spondylitic changes. There was moderate ventral spondylosis at C5-6, with right-sided involvement of the lateral recess.
Dr. Gillespie continued treating Daniel and cautioned him about reinjuring his neck or participating in any activity which could lead to reinjury. He did not feel that Daniel was mechanically functional in June 1999. By December 1999, Daniel's neck had improved. He had good range of motion and no palpable trigger points or muscle spasms. In January 2000, Dr. *1166 Gillespie increased Daniel's physical therapy to include work conditioning. By February 2000, he felt that Daniel was neurologically intact. A February 10, 2000 MRI revealed a bulging disc at L5 S1, with multilevel degeneration of the disc spaces. A caudal epidural steroid injection provided slight improvement to Daniel's lower back. A second epidural in April 2000, decreased his lower back pain further. By April 20, 2000, Dr. Gillespie felt that Daniel was approaching maximum medical improvement and they were moving toward the management of his chronic pain. He agreed with Dr. Goldware's prediction that Daniel would suffer from neck pain for the remainder of his life.
Daniel testified that he saw two chiropractors prior to the accident, one in California in the late eighties and Dr. Daigle. He stated that he saw Dr. Miller in February 1993, and a Dr. Crackhower in the early to mid-nineties for neck pain. He stated that a 1993 MRI revealed a herniated disc at C5-6. Daniel also testified that he was seen by Dr. Cenac in August 1995 for neck and shoulder pain, and that he was treated by him off and on for two and one-half years. He stated that he returned to Dr. Cenac in October 1997 with neck problems and that he was last treated by him on June 15, 1998.
Daniel testified that he had not suffered pain for several days prior to July 9, 1998, but that he experienced burning pain after the accident. He stated that he did not wish to undergo surgery because he did not like needles and did not wish to be cut on. He further testified that he could not afford to take off any time from Wear Parts. After undergoing surgery, Daniel stated that he was in pain, his shoulders were sore, his hands swelled three times their normal size, and he could hardly move his fingers. He testified that he slept in a recliner at home for several months following his five day hospital stay. He stated that he only left the recliner to use the bathroom due to his inability to ambulate as a result of his neck brace and the stitches in his hip from the bone graft.
Daniel testified that Cynthia and his sister cared for him while he was recovering from the surgery. When he was able to move around in late January, he stated that he walked up and down his driveway, which was twenty to thirty yards, as much as he could. He testified that he was later required to wear a bone stimulator around his neck after learning that the bone graft had shifted and failed to heal properly. He stated that he wore the stimulator three hours a day for ninety days.
After the accident, Daniel testified that he suffered a loss of memory, became easily upset, and was unable to do things that he could do prior to the accident. He stated that his relationship with Cynthia deteriorated due to the pressures of their children, home, business, and money.
Cynthia testified that Daniel was in greater pain than ever after the accident and was aggravated all of the time. After surgery, she stated that he swelled three times his normal size and had trouble breathing due to his size and the length of time he spent on the operating table. She testified that he could not separate his fingers due to the swelling and could not move his arms for approximately one month after the surgery. Cynthia stated that Daniel remained in the hospital for five days and, after his discharge, he slept in a recliner and needed assistance for at least two months. She stated that he began doing better two and a half to three months after the surgery. By that time, she stated that his pain was under control and Dr. Goldware allowed him to take off his neck brace.
*1167 Cynthia testified that Daniel noticed a tingling in his left hand in May 2000, which became progressively worse. She stated that Dr. Goldware felt that he was suffering from carpal tunnel syndrome in his left hand. Dr. Gillespie ordered an MRI, after which Dr. Goldware told Daniel that he was suffering from a soft neck, put him back in his neck brace, and required him to wear a bone stimulator for three hours a day for ninety days until the bone graft healed.
After the accident, Cynthia testified that Daniel became miserable and started taking anti-depressants. She stated that he was very limited in what he could do, although he could basically care for himself. She stated that he stopped all social activities after the surgery and was no longer able to coach basketball or play drums in a band.
Prior to the accident, she testified that he complained of moderate pain in his neck and having trouble caring for himself. She stated that he had trouble lifting weights, but could lift mild to medium weights if they were conveniently positioned. She further testified that he had trouble reading because of his neck pain and concentrating because of headaches. However, Cynthia testified that Daniel began improving after seeing Dr. Daigle. Just prior to the accident, she stated that he had no headaches, limitations in dressing himself, or problems sleeping. She testified that most of his symptoms had ceased.
Terry LeBlanc, Cynthia's brother, testified that Daniel was easy going prior to the accident, but, afterwards, he complained of headaches, feeling bad, and trouble remembering things. Prior to the accident, he testified that Daniel worked from approximately 7:00 in the morning until 3:30 in the afternoon. After the accident, he stated that Daniel worked less hours, was unable to lift things, and was unable to call his customers.
Jessica Boudreaux, the Abshires' goddaughter, testified that she worked in Wear Parts' office with Daniel. Prior to the accident, she stated that he worked from 7:00 a.m. until 5:00 p.m. After the accident, she testified that he was only able to work four to five hours a day at the most. She stated that Daniel solved all of the problems at Wear Parts prior to the accident, but that problems did not get solved afterwards unless Daniel was present.
Shalton testified that Daniel was unable to work for a couple of weeks following the accident because he could hardly walk. After that, he stated that Daniel was only able to work one or two hours a day due to pain.

Medical Expenses
A defendant takes his victim as he finds him. Thus, it follows that the defendant is responsible for all natural and probable consequences of his tortious actions. Bryan v. City of New Orleans, 98-1263 (La.1/20/99); 737 So.2d 696; Foster v. Cohen, 99-98 (La.App. 3 Cir. 6/30/99); 742 So.2d 47, writ denied, 99-2290 (La.11/12/99); 750 So.2d 196. The jury rendered a verdict awarding Daniel $9,980 in past medical expenses from the date of the accident through his treatment with Dr. DeAraujo. Since Dr. DeAraujo testified that any surgery performed from an anterior approach would not be related to the accident, the jury obviously decided that Daniel's treatment prospective to this appointment was not accident-related. However, we find that the jury was clearly wrong in not awarding Daniel medical expenses for treatment he received after Dr. DeAraujo's examination.
Drs. Goldware, DeAraujo, and Foster all agreed that the accident aggravated *1168 Daniel's preexisting condition and resulted in the need for surgery. Drs. Daigle and Cenac further stated that he was not a surgical candidate prior to the accident. Thus, although he may have required surgery at some point in the future, Daniel is entitled to recover medical expenses for his surgery and post-surgical care since these were a consequence of the July 9, 1998 accident. Accordingly, the judgment of the trial court is amended to award Daniel past medical expenses of $77,991.20.

General Damages
In reviewing a general damages award, our first inquiry is whether the "award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the `much discretion' of the trier of fact." Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1260 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). "It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award." Id. at 1261. If the amount awarded is abusively low, we raise the award to the lowest amount "reasonably within that discretion." Id. at 1260.
Considering the evidence, we find the jury's award of $5,000 for general damages abusively low. After reviewing cases involving similar injuries, we find that the lowest amount reasonably within the jury's discretion is $150,000. See Thibodeaux v. Wal-Mart Stores, Inc., 98-556 (La.App. 1 Cir. 4/1/99); 729 So.2d 769, writ denied, 99-1244 (La.6/18/99); 745 So.2d 28; Jones v. Hyatt Corp. of Delaware, 94-2194 (La. App. 4 Cir. 7/26/95); 681 So.2d 381; Babineaux v. Lykes Bros. Steamship Co., Inc., 608 So.2d 659 (La.App. 3 Cir.1992), writ denied, 610 So.2d 819 (La.1993); McLemore v. Fox, 565 So.2d 1031 (La.App. 3 Cir.), writ denied, 569 So.2d 966 (La.1990). Thus, the judgment of the trial court is amended to increase the amount of general damages awarded to Daniel to $150,000.

ECONOMIC DAMAGES
In their final assignment of error, the Abshires argue that the jury erred by awarding Daniel only $11,250 in economic damages. Their request for economic damages was based on Wear Parts' business plan, which projected its future sales at $1,920,000 per year and predicted it capturing two percent of the $3,000,000,000 to $5,000,000,000 annual earth engaging industry.
A review of the record reveals that the jury was presented with conflicting evidence concerning the future viability of Wear Parts. Charles Achane, the president of the Southwest Louisiana Business Development Center and an authorized SBA intermediary, assisted the Abshires in preparing a business plan for Wear Parts, which projected its sales at $1,920,000 in the future. Achane testified that the Abshires would have been able to obtain $1,747,000 in financing to expand Wear Parts into the production of winter products, despite being delinquent on their note to the Bank, late in submitting employee withholding taxes to the IRS and state, having a negative equity of $197,000 and negative net income of $68,000 as of March 1998, and sustaining a net loss in the first two quarters of 1998.
Dr. Boudreaux, an economist specializing in measuring business valuation damages, valued Daniel's loss of earning capacity based on the business plan. He valued Wear Parts by subtracting its value, had Daniel had not been injured ($5,075,271), from its current value ($973,441), to reach an amount of $4,101,830. Dr. Boudreaux *1169 stated that the value of the firm was based on the assumption that the business plan would have been utilized and achieved and that the sales level of $1,920,000 would have been achieved a year later. He further took into consideration those things Cynthia said Wear Parts would need to be made whole: equipment, land, inventory, building, key employees as of date of accident, and bid registration. Dr. Boudreaux also discussed the five "C's" of credit: character, capacity, capital, economic conditions or future cash flows, and collateral. He stated that character is considered the most important by a banker, while collateral is the least important.
On cross examination, Dr. Boudreaux admitted that Wear Parts was in a negative equity situation during the first two quarters of 1998, it was delinquent in paying its accounts, was late in repaying its loan to the Bank, and was late in submitting its withholding taxes to the IRS. He stated that this was to be expected since Wear Parts had expanded, however, it was showing very strong growth. Although he had reviewed Wear Parts' profit and loss statement, he stated that these were not of much importance since this was a new firm. He also stated that it was very difficult for most firms starting out to achieve high profits. With regard to the late withholding taxes, Dr. Boudreaux testified that this would cause concern, but would not be a red flag. He stated that all of these things would be considered by a banker.
State Farm presented the testimonies of two certified public accountants to counter the Abshires' evidence. Sara Roberts, a specialist in financial consulting, disagreed with Achane's prediction that the Abshires would be able to obtain financing based on their business plan. In reaching her conclusions, she discussed four areas considered by banks in lending money: equity, collateral, experience of the individuals, and cash flow or financial projections.
Roberts testified that Wear Parts had a negative equity of $234,000 on December 31, 1998, thus, it would need to have a positive equity position of $660,000 based on a four to one ratio of debt to equity before a bank would loan them the $1,700,000 they were seeking in their Phase III expansion. She further stated that Wear Parts had insufficient collateral since banks will typically not finance more than eighty percent of an entity's fixed assets. Since Wear Parts had $970,000 in assets, she stated that it required an additional $800,000 of collateral before a bank would finance $1,700,000. With regard to the experience of the individuals, Roberts stated that the Abshires were very strong in sales experience, but only one person (Villasenor) had any manufacturing experience.
The final area discussed by Roberts was cash flow or financial projections. She testified that the business plan's narrative was poorly written and did not adequately address how Wear Parts would jump from $400,000 in sales to its forecasted sales of $1,900,000. Thus, she did not feel that this was an achievable goal. In conclusion, Roberts stated that problems with any one of the areas would have caused a bank to reject the entire business plan.
Roberts further testified that several of Achane's numbers in the business plan were flawed. After identifying and researching Wear Parts' competition, she determined that the sales in the earth engaging industry would total $7,772,000. Twenty percent of the market would equal $1,500,000, less than Achane's projection of $1,900,000. She also found a deficiency in his projections concerning the costs of goods sold since his projections were based strictly on direct materials and did not include the costs of salaries, wages, employee *1170 benefits, maintenance, equipment rental, or shipping. When Roberts included these items in the cost of Wear Parts's goods, she determined that it fell short of the industry average. She further stated that Achane's gross profit margin figure of 84.4% was "ludicrous" and unrealistic since the industry wide profit margin based on the Standard Industrial Code 3531 for small manufacturers found in the Robert Morris and Associates guide was 26.7%. Roberts reached a gross profit margin of 58.7% after including all of the numbers left out by Achane. She stated that this number was still significantly higher than the industry gross profit margin. She further determined that the profit before tax was 3.6% industry wide, whereas Achane determined Wear Parts' profit before tax at 34.9%. Roberts testified that this number was also unachievable for a new start-up company.
Debra Gordon, a specialist in economics and business valuation, reviewed Dr. Boudreaux's report and noted several deficiencies. She strongly disagreed with his conclusion based on his use of the cash flow number because he incorrectly used the cash flow from Achane's business plan, which she said was not in effect and was completely speculative. Gordon further stated that the use of the most current cash flow was recommended for the Gordon Model for business valuation, which should be the net cash flow available for pay out to the owners or investors.
Gordon also disagreed with several other numbers used by Dr. Boudreaux in valuing Wear Parts. She stated that his 19.96% rate of return is extremely low for a start-up company because a bank is taking more risk. She described his growth rate of 10% as unreasonable and stated that a more reasonable number would be 3%. Gordon further noted that Dr. Boudreaux did not include a discount on the valuation or even mention it in his report.
Gordon further found several inconsistencies in Achane's business plan. She testified that the amount of market share shown in the business plan did not correspond to the $1,900,000 in sales shown in the projections, and that the business plan failed to explain how Wear Parts would reach that amount in sales. Gordon testified that the 85% projected gross profit margin was totally unrealistic, even though the business plan listed that percentage as 34%. She opined that the Abshires failed to really analyze their costs because the industry average is 29.1%. She also stated that the industry average for earnings is 3.6%, but that the business plan listed Wear Parts earnings at 37.5%. Gordon concluded her review of Achane's business plan by stating that numbers listed in his plan were not achievable.
Gordon testified that Wear Parts was $198,000 in the hole by March 31, 1998, since it owed its creditors $500,000 and only had $300,000 in assets. She noted that it was late in paying its vendors and, by June 1998, had $70,000 in accounts payable. She stated that it eventually went cash on delivery with most of its vendors. It was also late in paying its workers' compensation premiums. Gordon testified that the Abshires were late in paying the Bank and had asked for further financing from two other banks, but had been refused. She stated that it failed to pay its payroll taxes for the first six months and through the end of 1998. Gordon explained that the IRS penalizes a business 100% for failure to submit payroll taxes and that a lender typically will not lend money to a business until it is paid in full with the IRS. She stated that the failure of a business to pay its payroll taxes indicates a fairly desperate situation *1171 since the business is using the payroll taxes to fund their business.
Gordon determined Daniel's wages from 1996 through 1998. After analyzing his tax returns, she determined that he earned $29,000 in 1996, $23,500 in 1997, and $27,500 in 1998. She further noted that Wear Parts ceased operations on July 1, 1999, at which time Gueydan Manufacturing began operations. The Bank forgave the Abshires' $400,000 loan in exchange for Wear Parts' equipment, property, land, and title. Gueydan Manufacturing leases the same from the Bank for $1,000 per month. Gordon stated that she did not know what became of the other debts owed by Wear Parts to its vendors.
In conclusion, Gordon testified that she disagreed with Dr. Boudreaux's valuation of Wear Parts at $5,075,271 because it is extremely difficult to find someone willing to pay ten times the projected earnings for a closely held business, which has only been in operation for ten months. Although she did not determine Wear Parts' fair market value, she stated that it would be extremely difficult to come up with anything other than an extremely minimal amount since it is losing tremendous amounts of money and has virtually no cash flow. Finally, she disagreed with Dr. Boudreaux's statement that collateral is the least important element considered by a banker. In her experience, she stated that collateral is generally the most important consideration.
Cynthia testified Daniel was the national salesman for CPL until it was bought out by Bucyrus Blades, and that she was his secretary. She stated that they incorporated Wear Parts after returning to Gueydan and began brokering winter products such as snow plow blades, snow plow shoes, and embedded product lines. After Bucyrus Blades asked if they were interested in purchasing its drag shoe equipment, the Abshires agreed when Villasenor agreed to come with the equipment. Shalton also agreed to move to Louisiana to work with them and build the company. Cynthia stated that she and Daniel borrowed $346,000 from the Bank to purchase the property and began manufacturing on September 9, 1997. She testified that manufacturing was going well prior to the accident and that they were recruiting employees to run the facility.
Cynthia testified that they approached Achane for help in preparing a business plan in order to gain financing for expansion into winter products. She stated that Wear Parts was seeking $1,747,000 in investment financing in order to purchase equipment and pay consultants to help them set up their facility. Included in this was an amount to pay off their loan with the Bank or another SBA entity and pay off any debt incurred during the construction phase. Cynthia testified that a larger facility would be needed due to the need for conveyor belts and overhead cranes. She stated that the second phase also included purchasing property across the street from their existing facility for the installment of a daycare and condos or apartments for their employees.
In the spring of 1998, Cynthia testified that Wear Parts was growing fast and was sending out test products, and that she and Achane were working on the business plan. Prior to the July 9, 1998 accident, Cynthia stated that Wear Parts' debt was approximately $350,000 to $400,000, plus accounts payable. She admitted that Wear Parts began January 1998 with an unpaid debt of $118,000. She stated that they were late in repaying their loan to the Bank and, by April 1998, had exhausted their line of credit with the bank. On June 2, 1998, they entered into a ninety-day extension with the bank which allowed them to accumulate the interest on the loan. Cynthia further admitted that Wear *1172 Parts was late in submitting its payroll taxes to the IRS and state during the first two quarters of 1998, and was late in paying its suppliers. She stated that they eventually went C.O.D. with their suppliers. She admitted that Wear Parts was sued three separate time after the accident, for debts which were incurred prior to the accident.
Cynthia testified that they never finished the business plan or pursued a small business loan because Daniel was unable to work. She stated that Shalton left Wear Parts in October 1998, and that Villasenor left in June 1999. She testified that the business suffered greatly because Daniel was not there. Cynthia stated that they were approached by Hibernia National Bank and Mid South Bank, both of which were soliciting small businesses. She stated that she and Daniel met with the banks after the accident, but that Hibernia turned them down and Mid South required them to retire their debt before lending them money.
In July 1999, Cynthia testified that they and their lawyers met with the Banks' lawyers and agreed that the Bank would forgive their debt in exchange for Wear Parts' equipment, land, and building. Wear Parts ceased to operate and the Abshires incorporated Gueydan Manufacturing, which leased all of the equipment and property from the Bank. Cynthia testified that Gueydan Manufacturing is similar to Wear Parts in that it brokers equipment and manufactures products; however, it is not registered throughout the United States for bidding as Wear Parts was.
Cynthia listed the assets owned by Wear Parts on July 9, 1999. These included the land, building, equipment, inventory, key employees, including Shalton and Villasenor, inside salesmen, and bid registration. She testified that they would require all of these in order to be placed in the position they were prior to Daniel's accident.
Daniel testified that Wear Parts was in a negative equity position in the first half of 1998, but he stated this was because they had just borrowed $300,000. He stated that there was no way they could repay that amount in one to two months or five to six years and still have a positive net worth. He listed Wear Parts' assets as the facility, the land, and the machinery. He was aware of one suit by a vendor against Wear Parts, and was aware that it was delinquent in repaying two other vendors. Daniel testified that Wear Parts was late in repaying its loan to the Bank, and that the Bank agreed to allow it a ninety day deferred payment in order to allow it to build up its cash flow. He agreed that Wear Parts had a cash flow problem. He further testified that he was aware of tax liens against Wear Parts due to its failure to submit its withholding taxes to the IRS.
As the reviewing court, we may not set aside a jury's finding of fact in the absence of manifest error or unless it is clearly wrong. Stobart v. State, Through DOTD, 617 So.2d 880 (La.1993). If the jury's findings are reasonable in light of the record reviewed in its entirety, we may not reverse, even if we are convinced that, had we been sitting as the trier of fact, we would have weighed the evidence differently. Id. This holds true even when the evidence being weighed is expert testimony. "Where testimony of expert witnesses differs, it is for the trier of fact to determine the most credible evidence and a finding of fact in this regard will not be overturned absent manifest error." Darbonne, 774 So.2d at 1028. In this instance, the jury was presented with two different views of the evidence. It chose to believe State Farm's position that Wear Parts was not a viable entity prior to the July 9, 1998 accident, and that Daniel's accident did not have the effect on its performance as contended *1173 by the Abshires. Since this finding is reasonable in light of the record, we cannot say that the jury erred in failing to award Daniel damages based on Wear Parts' valuation after the accident.
However, the jury awarded Daniel $11,250 in lost wages, which equals five months wages from the date of the accident through December 2, 1998, the date of his examination by Dr. DeAraujo, a point which was argued by State Farm in both its brief and oral argument.[1] As we stated in the award for medical expenses, a defendant takes his victim as he finds him. Thus, Daniel is entitled to be compensated to the full extent of his aggravation and we find that he is entitled to damages for his lost wages from July 9, 1998, the date of his accident, through February 21, 2000, the date that Dr. Goldware stated that he should get on with his life, or $2,250 ($11,250 divided by five months) multiplied by nineteen and one-half months which equals $43,775. Accordingly, we amend the judgment of the trial court to increase his damages for lost wages from $11,250 to $43,775.

CONCLUSION
For the foregoing reasons, the judgment of the trial court is amended to award Daniel $77,991.20 in medical expenses, $150,000 in general damages, and $43,775 in lost wages. The judgment is affirmed in all other respects. The costs of this appeal are assessed equally between the plaintiffs-appellants, Daniel and Cynthia Abshire, and the defendants-appellees, Addison Wilkenson and State Farm Mutual Automobile Insurance Company.
AFFIRMED AS AMENDED.
NOTES
[1] Daniel's salary was $27,500 in 1998.