817 So.2d 347 (2002)
Ernest KEENER, Jr. and Julie W. Keener
v.
MID-CONTINENT CASUALTY, Benson Chevrolet Co., Inc. State of Louisiana a/k/a Best Chevrolet, Inc., and Tyrone Daniel.
No. 01-CA-1357.
Court of Appeal of Louisiana, Fifth Circuit.
April 30, 2002.
*349 Terrance J. Hand, Ronald E. Lampard, P. Lindsey Williams, Metairie, LA, for Plaintiffs/Appellees.
Morgan J. Wells, Jr., Christopher R. Pennison, Larzelere, Picou & Wells, L.L.C., Metairie, LA, for Defendants/Appellants.
Panel composed of Judges SOL GOTHARD, THOMAS F. DALEY, and WALTER E. ROTHSCHILD.
THOMAS F. DALEY, Judge.
Plaintiffs Ernest Keener, Jr. and Julie Keener filed suit against defendants, Mid Continental Casualty Company, Best Chevrolet, Inc., and Tyrone Daniel (defendants), as a result of a motor vehicle accident on December 21, 1998. Ernest Keener, a 39 year old auto glass installer, was driving his 1997 Ford Ranger on Veterans Highway in Kenner, Louisiana, when he was rear-ended by a Chevrolet Astro driven by Daniel, an employee of Best Chevrolet. More than one year after the accident, Ernest Keener underwent surgery for a ruptured lumbar disc. Approximately eight days later, Keener suffered a large stroke to the right side of his brain. Plaintiffs claimed in their suit that Keener's stroke was caused by his lumbar surgery, which they alleged was necessitated by the accident in question. The jury returned a verdict in favor of Keener, *350 awarding him a total of $887,864.00 in damages.[1] They also awarded his wife, Julie Keener, $200,000.00 for loss of consortium.
Defendants appeal, arguing several Assignments of Error. First, they argue the trial court erred in failing to qualify their expert witness, Dr. William C. Lloyd, III, as an expert in biomechanics and injury causation, and refusing to allow him to testify. Second, they argue that the trial court erred in denying their Motion in Limine, based upon Daubert[2] and its progeny, allowing the testimony of plaintiff's neurosurgeon, Dr. Donald Adams, regarding causation of the stroke plaintiff suffered nine days after lumbar surgery.
The defendants also argue that the evidence failed to show by a preponderance that plaintiff's stroke was caused by the automobile accident in question. They further argue that the trial court committed reversible error by not granting defendants' Motion for Directed Verdict regarding the relationship of the stroke to the accident. Finally, they argue that the loss of consortium awarded to Julie Keener was excessive.
Plaintiffs answered the appeal, arguing that the trial judge violated the collateral source rule and erroneously allowed the defendants a credit for certain past medical expenses incurred by Ernest Keener, Jr, contending that the total amount of damages for past medical expenses should be increased to $112,604.00.[3]
We affirm the rulings of the trial court regarding Dr. William C. Lloyd and Dr. Donald Adams. We affirm the trial court's ruling denying the defendants' Motion for Directed Verdict. We affirm the jury's finding of fact that Mr. Keener's stroke was causally related to the lumbar surgery. We affirm the amount of the award to Julie Keener for loss of consortium. We reverse the trial court's ruling regarding the credit awarded to defendant for past medical expenses.

FACTS
The defendants do not contest their liability in the underlying rear-end accident, only the damages that have flowed from that accident. Defendants contend that the low impact collision between defendants' and plaintiffs' vehicles could not have caused a serious back injury.
Plaintiffs called as a witness, Charlotte Phillips, a guest passenger in defendant, Best Chevrolet's courtesy van driven by Tyrone Daniel that rear-ended Mr. Keener's truck. She testified that the van hit the pickup truck with a "pretty good bam," enough of an impact to throw her forward. She thought the van was traveling about 12 to 15 miles per hour at the time of the impact. Phillips noticed damage to the grill of the van, and some slight damage to the bumper of the pickup truck. Phillips sought treatment from her family physician, who referred her to a chiropractor, who treated her for approximately eight *351 months for neck, lower back, and headaches after the accident.
Immediately after the accident, Phillips said she was very concerned for the driver of the pickup truck (Keener) because he was very disoriented, his eyes were crossed, and he could not focus. When he tried to get out of his vehicle, he laid over on the bed of the truck.
Tyrone Daniel, the employee of Best Chevrolet who drove the van, was called under cross examination. Daniel testified that he tried to stop the van before it struck Keener, but the brakes wouldn't stop the van, and he rear-ended the truck. He deferred to the police report's information that he had estimated his speed as 30 miles per hour. He noticed V-shaped damage to the grill of the Astro van caused by contact with Keener's truck's trailer hitch.
Gregory Welsch, the Kenner police officer who investigated the accident, testified that he prepared a report of the accident. He interviewed the occupants of both vehicles. He determined that Keener's truck was at a full stop, due to a red light and traffic congestion. It was rear-ended by the white Chevrolet Astro van in the right lane of the 2600 block of Veterans Highway, heading westbound. He noted the van's speed as 30 miles per hour, based upon information given him by Daniel. He recalled light damage to both vehicles, as indicated in his report. He did not classify it as a light impact, though, due to the fact that one vehicle was completely at rest and one was moving when the impact occurred.
Plaintiff Ernest Keener testified that the van struck him hard enough to knock off his hat and make his seat belt grab him. He remembered feeling very disoriented and that he couldn't immediately get out of the truck. He had two windshields in the back of his truck that were broken by the impact. Though he did not feel injured at the time, he testified that he was sore. Later that evening at home, he was nauseated and stayed in his recliner all night, not eating supper. His pain progressed and did not resolve, resulting in his seeking treatment at Dr. Altman's office.

DR. LLOYD'S QUALIFICATION AS AN EXPERT WITNESS
Defendants argue that the trial court abused its discretion by failing to qualify Dr. Lloyd as an expert witness in the fields of biomechanics and injury causation analysis. They argue that the trial court clearly disregarded or ignored Dr. Lloyd's testimony regarding his formal education and experience, which include mechanical engineering, the practice of medicine, and consultancy in biomechanics and injury causation analysis.
Plaintiffs filed a Motion in Limine to exclude Dr. Lloyd's testimony, arguing that neither his educational background nor experience made him capable of rendering an opinion in this case about injury causation. The trial court denied the Motion in Limine after the hearing, stating that the question would be decided at the time of the witness's voir dire to qualify him as an expert.
At his voir dire, Dr. Lloyd testified that he graduated in 1975 from the U.S. Military Academy at West Point, New York, where he majored in mechanical engineering. He served two years in the U.S. Army Corps of Engineers. He attended medical school at F. Edward Hebert School of Medicine, the nation's federal military medical school, in 1980. He was licensed to practice medicine in Georgia and Texas. Dr. Lloyd described the diverse clinical experience he received during his one year internship following medical school, before he chose a specialty. He received special training in ophthalmology *352 surgery, and also in pathology, and served a fellowship in eye pathology. Dr. Lloyd said that sometimes, though, he helped staff other hospitals when they were short staffed, which meant performing more general medical duties. He said that as an intern, he had experience as part of a team that responded to trauma victims, and was currently certified in advanced trauma life support.
Dr. Lloyd retired from the military, after which he successfully competed for a position with Biodynamic Research Corporation, the nation's leading physician-based injury causation analysis firm. Because much of the work that BRC performs relates to motor vehicle accidents, he completed a course of instruction in accident reconstruction at Northwestern University. That course addressed the engineering and physics of motor vehicles and what happens to vehicles when accidents occur. Dr. Lloyd testified that he has consulted in around 150 motor vehicle accident cases, determining the biomechanics and causation effect of those accidents.
On cross, Dr. Lloyd stated that he still practiced medicine in the fields of ophthalmology and pathology. Ophthalmology is the surgical and medical management of diseases in the eye; pathology is the study of health and disease. He had been employed by BRC for approximately a year and a half. He had never given a paper or seminar on lumbar disc disease to any physicians, nor was he currently treating any patients for spinal injuries. He admitted that he did not claim to be a specialist in spinal injuries, nor did he hold himself out as a radiologist, an orthopedic doctor, or a neurologist or neurosurgeon. Dr. Lloyd agreed that these fields would be better trained in the diagnosis and care of the human spine.
Dr. Lloyd testified that a good percentage of his consulting with BRC involved insurance companies who were defendants in motor vehicle accidents. He acknowledged that he had testified in only one trial previously, in Texas, and had given a deposition in only one spinal case involving a motor vehicle. Dr. Lloyd was trained in accident reconstruction, but said he didn't claim to be an accident reconstruction specialist, but a specialist in injury causation analysis. He had never been qualified in any court as an expert in accident reconstruction.
Plaintiffs' counsel objected to Dr. Lloyd's being qualified as an expert in biomechanics and injury causation analysis, arguing that his voir dire revealed he lacked the requisite training and specialty, under Daubert, Foret, and the Code of Evidence, to testify regarding spinal injuries. Based upon the voir dire, the trial court found that Dr. Lloyd was not qualified to testify as a biomechanical engineer, noting that there was no testimony whatsoever regarding his training, experience, or expertise as a biomechanical engineer. Dr. Lloyd did not testify.
The qualification of expert witnesses is discussed in Code of Evidence art. 702, which states:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
The trial court found that Dr. Lloyd was not qualified by knowledge, skill, experience, training, or education, to render an opinion, based upon the field of biomechanics, whether Mr. Keener's back injury was caused by what defendants have termed a "low impact" collision.

*353 Generally, trial judges have a gatekeeping function and vast discretion when determining whether to admit expert testimony. However, the expert's opinion must be based upon correct assumptions of facts and supported by the record. Additionally, the expert's testimony must be both reliable and relevant. "[A]n expert is one who, usually by education or experience, has a unique knowledge of the subject matter at issue[.]" It is appropriate to admit reliable, relevant expert testimony when the expert has specialized knowledge to assist the trier of fact in its fact-finding function. (Cites omitted.)
Evans v. DeRidder Mun. Fire & Police Civil Service Bd., 2001-118 (La.App. 3 Cir. 6/27/01), 789 So.2d 752.
A trial judge has wide discretion in determining whether to allow a witness to testify as an expert, and this includes the determination of how much and what kind of education and/or training adequately qualify an individual as an expert, and his judgment will not be disturbed by an appellate court unless it is clearly erroneous. Abshire v. Wilkenson, XXXX-XXXX (La.App. 3 Cir. 5/30/01), 787 So.2d 1158. See also Posecai v. Wal-Mart Stores, Inc., 98-1013 (La.App. 5 Cir. 3/30/99), 731 So.2d 438.
We find the trial judge did not abuse his discretion in failing to qualify Dr. Lloyd in the fields of biomechanics and injury causation. Dr. Lloyd's voir dire showed a lack of educational background, expertise, and experience in both spinal injuries and their relationship to motor vehicle accidents. Though defendants emphasize Dr. Lloyd's "flexible internship" that exposed him to orthopedics, neurosurgery, and radiology, we note that one-year internship occurred in or around 1981, the year after Dr. Lloyd graduated from medical school, some 20 years prior to trial. Further, Dr. Lloyd's certification in advanced trauma life support was not shown to be relevant to the analysis of Mr. Keener's spinal disc injury causation. Nor did the voir dire explore the relevance of any of Dr. Lloyd's mechanical engineering background. The voir dire did not establish that Dr. Lloyd had the requisite educational background, training, expertise, or experience to testify regarding the possible causation of Keener's disc injury.

TESTIMONY OF DR. DONALD ADAMS
Plaintiffs offered the testimony of Dr. Donald Adams, plaintiff's treating neurologist, who opined that Keener's stroke nine days after the lumbar surgery was related to that surgery. Defendants filed a Motion in Limine Regarding Stroke Testimony, seeking to exclude the testimony of Dr. Adams regarding any causal link between the accident in question and plaintiffs stroke, as well as any other evidence attempting to link plaintiff's stroke to the accident. Defendants argued that the methodology surrounding Dr. Adams's conclusions about the relationship of the stroke to the lumbar surgery was not reliable under the standards set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc.,[4] as adopted by the Louisiana Supreme Court in State v. Foret.[5] Following the pretrial hearing on defendants' Motion in Limine, the trial court orally rendered the following ruling:
The Motion in Limine is denied. The trier of fact in this case will hear both sides of this particular story and certainly you both have compelling arguments. The Court finds that it is appropriate that the jury, who will be the trier of *354 fact, hear the testimony from those expert witnesses and make the determination.
Dr. Adams was qualified as an expert in neurology and allowed to testify regarding his treatment and diagnosis of Mr. Keener, and his opinion about the medical causation of Mr. Keener's stroke.
Defendants argue that the trial court failed to perform its gatekeeping function and its decision to allow the jury to hear his testimony was manifestly erroneous, because the methodology surrounding his medical causation opinion was unreliable. Defendants argue that Dr. Adams used improperly the methodology of "differential diagnosis." Plaintiffs argue that Dr. Adams used differential diagnosis properly to arrive at his conclusion. Plaintiffs offer this definition of differential diagnosis, in brief, from Westberry v. Gislaved Gummi AB, 178 F.3d 257, 262-3 (4th Cir.1999):
Differential diagnosis, or differential etiology, is a standard scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated. A reliable differential diagnosis typically, though not invariably, is performed after "physical examinations, the taking of medical histories, and the review of clinical tests, including laboratory tests," and generally is accomplished by determining the possible causes for the patient's symptoms and then eliminating each of these potential causes until reaching one that cannot be ruled out or determining which of those that cannot be excluded is the most likely. This technique "has widespread acceptance in the medical community, has been subject to peer review, and does not frequently lead to incorrect results." (cites omitted.)
A review of Louisiana cases shows that physicians' use of differential diagnosis is usual and customary to evaluate a patient's symptoms, and a physician's failure to employ this method to arrive at a diagnosis has been found to breach the standard of care. See Corley v. State, Dept. of Health & Hospitals, 32,613 (La.App. 2 Cir. 12/30/99), 749 So.2d 926.
In Daubert, the Supreme Court stated, "in order to qualify as `scientific knowledge,' an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validationi.e., `good grounds' based on what is known. In short, the requirement that an expert's testimony pertain to `scientific knowledge' establishes a standard of evidentiary reliability." 509 U.S. at 590, 113 S.Ct. at 2795. The standards imposed by Daubert require the trial court to perform a "gatekeeping" function by deciding whether the expert evidence or testimony is both reliable and relevant. To qualify as scientific evidence, an inference, assertion, or opinion must be derived by a scientific method. Daubert, 509 U.S. at 588, 113 S.Ct. at 2794. We determine whether the reasoning or methodology underlining the proposed testimony pertains to valid scientific knowledge by considering: 1) whether the theory or technique that is the subject of the proposed testimony can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) a technique's known or potential rate of error; and (4) whether there is general acceptance of a theory or technique within the relevant scientific community. 509 U.S. at 593-94, 113 S.Ct. at 2797.
The court need not determine that the expert testimony a litigant seeks to offer into evidence is irrefutable or certainly correct. As with all other admissible evidence, expert testimony is subject to *355 being tested by "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." Daubert, 509 U.S. at 596, 113 S.Ct. at 2798.
Defendants cited Dr. Adams's deposition testimony in support of their motion, to which they attached a small excerpt. In that excerpt, Dr. Adams stated that in order to determine the cause of Mr. Keener's stroke, he ordered an elaborate workup for what is termed a hypercoagulable state and also an elaborate workup for a cardiac source of the stroke. In addition, Mr. Keener had an MRI of his head to better define the lesion and a magnetic resonance angiogram to investigate the arterial supply to the brain. Dr. Adams was not able to define any abnormality of the blood vessels other than the fact that one of them had, obviously, become occluded (the stroke). The carotid artery system was unremarkable. Some of the vessels supplying a distribution of what is termed the right middle cerebral artery were occluded. He was not able to find a specific cause of that occlusion.
Mr. Keener underwent a transesophogeal echocardiogram to test cardiac function, which did not show a problem. All of the blood work looking for a specific hypercoagulable state was normal, Dr. Adams said. After reviewing all these results. Dr. Adams felt that Keener fit into what is now defined as a cryptogenic stroke, which means they were unable to define a specific cause of the stroke. Dr. Adams said that this was not unusual, as 15% of people diagnosed with strokes fall into this category. Dr. Adams also ruled out that Mr. Keener had a genetic predisposition to the blood vessels spontaneously clotting.
Dr. Adams assumed that the stroke and the surgery were somehow related, though he could not exactly state how. Although it was a rare occurrence, he stated that on the basis of current medical literature, a variety of events can produce a hypercoagulable state or produce other abnormalities in the blood's clotting mechanism, and since all other possible known mechanisms of stroke were unequivocally negative, he related the stroke to the surgery eight days previously. Dr. Adams noted that Keener did not appear to have peripheral vascular disease. And nothing in his evaluation following his lumbar surgery indicated that he was at increased risk for a stroke.
Defendants, in their Motion, do not suggest that Dr. Adams's treatment or the tests that he ordered were inadequate or incomplete, and do not contest the results. They argue that Dr. Adams admitted that medical science does not understand and cannot explain the physiological process by which the plaintiff's stroke may have developed following his lumbar surgery. Defendants argue that this admission means that Dr. Adams was unable to provide the necessary underlying scientific predicates for his opinion, and that his opinion was based upon a speculative and unsubstantiated theory. It is apparent from Dr. Adams's testimony in his deposition that he moved to rule out every possible known mechanism for stroke before concluding that Mr. Keener's stroke was probably related to his very recent lumbar surgery, a relationship that he acknowledged is not well understood at this point in time, though there is some discussion of this type of stroke in the medical literature. The temporal association between the surgery and the stroke was important in his conclusion.
We find that the trial court did not err in admitting Dr. Adams's testimony. The requirements of Daubert and Foret were satisfied. Daubert requires that to qualify as scientific evidence, an opinion *356 must be derived by an accepted scientific method; the four-part test is illustrative, but is not an exclusive guide to determine the reliability of scientific testimony. We find that Dr. Adams's use of differential diagnosis, which is clearly an accepted methodology in the medical community, was proper. Dr. Adams moved to rule out every possible explanation of Mr. Keener's stroke before concluding that it was probably related to the surgery. Dr. Adams was honest in his acknowledgment that medical science cannot, at this point in time, clearly explain the cause of Mr. Keener's stroke, but that there was some suggestion, in current medical literature, that the temporal association between the surgery and the stroke was a factor. The fact that his opinion was not admittedly 100% certain goes to its weight, not its admissibility. The focus of the gatekeeper under C.E. art. 702 "must be solely on principles and methodology, not on the conclusions that they generate." Daubert, supra at 595, n. 6, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469.

MOTION FOR DIRECTED VERDICT; SUFFICIENCY OF THE EVIDENCE
Defendants argue that plaintiffs did not prove by a preponderance of the evidence that Mr. Keener's stroke was caused by the lumbar surgery. This evidence consisted of the medical records and the testimony of doctors who qualified as expert witnesses. They also argue that the trial court abused its discretion in denying their Motion for Directed Verdict, made following the plaintiffs' case.
The trier of fact is not bound by expert testimony; rather, expert testimony must be weighed just as any other evidence. The weight to be accorded to the testimony of experts depends largely on their qualifications and the facts on which they base their opinions. The trial court may evaluate expert testimony by the same principles as apply to other witnesses; it has great discretion to accept or reject medical or lay opinion. Delahoussaye v. Madere, 98-1033 (La.App. 5 Cir. 4/14/99), 733 So.2d 679 (cites omitted).
The court of appeal may not set aside the trial court's findings of fact, in the absence of manifest error or unless the findings are clearly wrong. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). Furthermore, "where two permissible views of the evidence exists, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong." Stobart v. State, 617 So.2d 880, 882-883 (La.1993).
Mr. Keener was treated by Dr. Stewart Altman's office, a general surgeon, Dr. George Murphy, an orthopedist, and Dr. John Schuhmacher, a neurosurgeon, following the accident for unresolved low back pain with radiation into his leg and foot. Each doctor found that the December 21, 1998 accident caused Mr. Keener to suffer a herniated lumbar disc. Dr. Donald Adams, a neurologist, treated Mr. Keener following his stroke, which followed the lumbar back surgery. Dr. Adams found that there was a causal relationship between the surgery and the stroke. Dr. Michael Wilensky, a neurologist who examined the plaintiff for the defendants, also found that there was a causal link between the surgery and stroke.[6] The jury had an ample evidentiary basis for its conclusion that the surgery caused Mr. Keener's stroke. In light of the record as a whole, we find that their *357 conclusion was not manifestly erroneous, and decline to disturb their finding of fact.
Dr. Stewart Altman's office treated Mr. Keener following the accident.[7] Dr. Altman testified that Keener gave a history of the auto accident on December 21, 1998. Spasms were noted and Keener reported back and neck pain, and headaches. Dr. Altman's office treated him conservatively, with pain medication, muscle relaxants, and some physical therapy. Mr. Keener continued seeing Dr. Altman's associate through May of 1999, with his neck symptoms improving, but the lower back symptoms remaining. An MRI was performed in May of 1999 that showed degenerative disc disease in the lumbar spine and a bulging disc affecting the L5 nerve root. Dr. Altman reviewed the films and felt that Keener had a herniated disc, related to the December 1998 accident. He noted that Keener had seen Dr. Burvant two years before for low back pain, but did not relate that to the present symptoms. After May of 1999, Dr. Altman's office referred Mr. Keener to an orthopedist, Dr. George Murphy.
Dr. John Schuhmacher, a neurologist,[8] testified that he saw Ernest Keener on October 25, 1999. He evaluated Keener for low back pain and right leg pain and numbness. Keener told him he had been in a motor vehicle accident on December 21, 1998, from which he had the progression of low back pain, as well as neck and left arm pain. He denied any prior back injuries. Keener said that he had been seen by Dr. Stewart Altman, who ordered an MRI of the lumbar spine at Clearview Medical Imaging on May 7, 1999, which showed an "abnormal disc." An MRI of the cervical spine performed there on June 9, 1999, was "mildly abnormal." Keener related the other doctors who had treated him, including neurologist Dan Trahant, whose diagnostic studies performed on July 7, 1999, indicated right L5 nerve root irritation.
Dr. Schuhmacher performed a physical examination and reviewed Keener's medical records and MRIs. He felt the MRI of May 7, 1999 of the lumbar spine showed minimal, broad-based, degenerative bulging of the L4-5 disc. His impression was degenerative lumbar disc disease with disc bulge at L4-5. He recommended continued conservative treatment.
Dr. Schuhmacher saw Keener one month later. Keener's pain had persisted, with radiation into the heel and foot. There was no lumbar spasm, but the doctor felt that Keener continued to have significant lumbar symptoms. In two weeks, his symptoms had not improved, and lumbar spasm was present. Dr. Schuhmacher felt that Keener had more symptoms than could be accounted for in his Clearview Imaging MRI, so he ordered a repeat MRI at East Jefferson Hospital on December 6, 1999. Dr. Schuhmacher felt that the imaging equipment at EJGH was far superior to the equipment at Clearview. He felt the EJGH MIR showed a foraminally ruptured lumbar disc at L5-S1 on the right side. Dr. Schuhmacher recommended surgery, because Keener had not improved.
When Dr. Schuhmacher compared the May 1999 MRI from Clearview with the December 1999 MRI from EJGH, there *358 was no doubt in his mind that the ruptured disc was also present in the May 1999 MRI. He considered the second MRI technically superior and this accounted for the majority of the "apparent" changes in the MRI studies. In summary, he felt that the May 1999 study from Clearview did reveal a right-sided L5 S1 disc herniation. Even if he had had the technically superior MRI when he first saw Mr. Keener, though, he would have still recommended conservative treatment at that point in time before recommending surgery.
Dr. Schuhmacher testified that surgery confirmed a ruptured disc at L5-S1, over into the neuro foramen, which was compressing the L5 nerve root as it traversed that canal. He performed a standard, partial lumbar disc removal of the part of the disc compressing the nerve, and also removed some bone to free up the nerve. He also removed a little bone at L4-5. Dr. Schuhmacher testified that they got a great surgical result, and Keener went home the next day.
Dr. Schuhmacher testified that Keener's ruptured disc was caused by this accident. And even though he learned that Keener had prior back pain, the doctor did not change his diagnosis, based on the fact that Mr. Keener had no back symptoms for two years prior to the accident. Dr. Schuhmacher gave Mr. Keener a 20 percent permanent whole physical impairment rating, which would place him in sedentary and light occupational fields. This rating was strictly related to his back, though, and did not consider any deficits relating to the stroke. After Mr. Keener was readmitted to the hospital following his stroke, Dr. Schuhmacher's care was limited to stabilizing him before turning his case over to Dr. Adams.
On cross, Dr. Schuhmacher admitted that Keener did not tell him of his previous back problems and pain, nor of his treatment with Dr. Kerl and Dr. Burvant for back pain prior to this accident. Dr. Schuhmacher was firm that his relation of the accident to the ruptured disc was not changed by the fact that he had not received the history of Keener's previous back problems. He noted that Keener apparently recovered from each of those episodes and was able to return to his usual and ordinary job, something he found significant. It was significant to him that after this accident, Keener suffered from new symptoms that did not resolve. He knew, from the MRI report from May of 1999, that Keener had degenerative disc disease prior to this accident.
Dr. Schuhmacher agreed that he had no information about how the auto accident happened. He also recalled that Keener reported he continued to work in his automobile windshield repair business, though in pain. He agreed, in general, that Mr. Keener's occupation might cause more wear and tear (degenerative) changes on his back than with a sedentary job. Had Keener not had the stroke, it was Dr. Schuhmacher's hope that the surgery would have permitted Keener to return to his usual job, though with the lifting restrictions he recommended.
Dr. Murphy, who was accepted as an expert[9] in the field of orthopedic surgery, testified that he saw Ernest Keener on May 24, 1999. Keener told him of the car accident in December of 1998 and reported his current pain status. He said he did not have any previous significant problems with his neck or back. By "significant," Dr. Murphy meant no previous back or neck surgeries or previous injuries that took an inordinate amount of recovery time or required MRI or CAT *359 scans to diagnose, or nerve damage. Dr. Murphy reviewed the lumbar MRI of May 1999 and felt it showed advanced degenerative changes at the L5 S1 level. He ordered a cervical MRI that showed some degenerative changes, but considered Keener's lower back to be the most trouble. He prescribed anti-inflammatory drugs and recommended nerve testing. The EMG showed damage to the L5 nerve root.
Dr. Murphy last saw Keener on August 9, 1999. Keener continued to have the same symptoms in his back and neck. Dr. Murphy testified that Keener would have to go through his primary care doctor to get a referral to someone else, because of the way Keener's insurance was set up. Apparently Dr. Murphy was unable to treat him any longer. Like Dr. Schuhmacher, Dr. Murphy had reviewed the two lumbar MRIs and found no real significant differences between the two. He agreed that someone with degenerative changes might be more susceptible to an injury in a rear-end collision than someone with a healthy back. Dr. Murphy said that the degenerative changes showed on the MRI were most likely not related to the accident, but he would attribute to the accident the symptoms of pain and numbness, the herniated disc, and the nerve damage.
On cross, Dr. Murphy did not recall if Keener told him of his previous episodes of back pain and treatment with Dr. Burvant. Dr. Murphy stated that most people have some prior history of backache and he didn't consider that clinically significant. It did not change his diagnosis that the herniated disc was related to the accident. His records were blank regarding whether Keener had advised him that prior to December 1998 he had been diagnosed with degenerative disc disease at L5-S1.
Dr. Murphy knew that Keener was in the auto glass business, but didn't know what that entailed. At the time he treated Keener, he was still intact neurologically. And though Dr. Murphy noted advanced degenerative changes in the lumbar spine at L5-S1, he never specifically reported that Keener suffered from a herniated or ruptured disc. His treatment never got to the point where surgery was recommended.
Dr. Donald Adams, plaintiff's treating neurologist and an expert witness in neurology,[10] testified that Keener had been admitted to ICU at East Jefferson by Dr. Schuhmacher, who asked Dr. Adams to participate in treating him for the stroke and evaluating him for its cause, and subsequently to provide medical input into his rehabilitation. Dr. Adams stated that he ordered a wide variety of tests in order to find the cause of Mr. Keener's stroke. He testified that evaluating stroke in a younger person (Keener was 40, which was young for a stroke) is different than evaluating stroke in an older patient. The tests evaluated the carotid artery system, responsible for about 25% of strokes, heart disease, diabetes, high blood pressure, peripheral vascular disease; angiogram, internal sonogram of the heart, and blood clotting tests were performed. Dr. Adams said that Mr. Keener had all of the tests that are currently available to define the cause of stroke, and all were negative. Emboli, or blood clots that may have formed and traveled to the brain, were also ruled out. MRI of the brain showed a large right-side stroke.
Because every test was negative, Dr. Adams was left with the conclusion that *360 Mr. Keener's stroke was causally related to the lumbar surgery nine days earlier. He testified that medical science is beginning to understand, as reflected in current literature, that the body may produce immune responses within 30 days of surgery that alter the normal clotting mechanisms of the blood, which can and may result in stroke. He said that this area of stroke research had not been fully researched and work was ongoing. He could not state with any certainty the precise mechanism involved in the surgery/stroke relationship, though he was comfortable that the relationship existed. He compared current knowledge to the argument 20 or more years ago that smoking does not cause lung cancer, a relationship that today is fully known, but at one time was controversial. He expressed certainty that medical research would eventually be able to identify the precise antibody or mechanism behind surgery-related strokes, but acknowledged that currently the precise cause behind the relationship was not clearly understood and that no specific process or mechanism had been identified that made the blood clot inappropriately after surgery. He acknowledged that the blood work was negative for blood clotting problems.
Dr. Adams reviewed the report of Dr. Michael Wilensky, the neurologist who examined the plaintiff's records on behalf of the defendants. In that report, Dr. Wilensky cited to the suggestion in medical literature that strokes can occur in the 30 day post-operative period, and concluded he could not explain what caused the plaintiff's stroke, but that he felt there was a causation factor between the lumbar surgery and the stroke that Keener suffered days after the surgery. Dr. Adams agreed with Dr. Wilensky's opinion.
Dr. Adams reviewed an MRI of Mr. Keener's brain that was performed following the stroke. He identified the large damaged portion of the right side of Mr. Keener's brain. Dr. Adams said that unfortunately, treatment for acute strokes was not very good, and consisted mostly of trying to stabilize things medically, which they did.
Keener was moved to rehabilitation three days after his admission to ICU, and stayed about one month. Keener continued to receive outpatient physical, speech, and occupational therapy for a long time, until his insurance benefits ran out. Dr. Adams said that Keener had the advantage of being relatively young and very dedicated and motivated to rehabilitation. Dr. Adams considered that Keener had made a remarkable and amazing recovery, considering the size of the stroke, though he still had considerable deficits. Keener suffered from spasticity on his left paralyzed side, and he had also developed epileptic seizures, which were difficult to control. Keener did not have any skilled use of his left hand, which would not improve significantly. He couldn't move rapidly without the risk of falling down, or carry items, because of the spasticity. Whereas his language skills were fairly good, an extensive neuropsychological evaluation performed by Dr. Bianchini revealed a lot of problems with how Keener's brain processes information, which Dr. Adams characterized as a bigger problem than the physical deficits. Dr. Adams also noted that Keener was not allowed to drive under Louisiana law until he had been seizure-free for at least six months and was likely to remain seizure-free. Keener was on his fourth combination of anti-seizure medications in an effort to control the seizures.
Dr. Adams testified that Keener would benefit from additional rehabilitation, in particular a specialized program designed to work with brain injuries that primarily *361 affect cognitive function. If Keener could learn strategies to compensate for those deficits, he would be more independent in society. He said that Keener would remain permanently on the anti-seizure medicines, as well as other medicines to control his spasticity. Keener currently took anti-depressants, which Dr. Adams said might not be permanent. Dr. Adams said that depression was a common problem in patients dealing with a debilitating condition like Mr. Keener was.
Dr. Adams stated that it was not necessarily true that maximum medical improvement was accomplished in the first six months following stroke. He found that many times, improvements were increased six months to one year following stroke, and with the right therapies, continued improvements could result from three to five years after the stroke. He was not sure that there was an upper time limit within which improvement would maximize.
On cross examination, Dr. Adams acknowledged again that he could not identify the exact antibody response or process by which this stroke was specifically caused, but maintained his position that it was causally related to the surgery. He felt certain that in ten years, medical research would have enough information to identify these processes, though it could not do it presently. He acknowledged that the relationship between stroke and surgery was rare and unusual.
Dr. Adams stated that he felt that Keener had made the large majority of improvements that would occur, but that did not mean that more improvements were not possible. Dr. Adams said that the goal of rehabilitation was to restore the individual to the highest possible function in society and the community, not necessarily with the specific goal of returning that individual to the work force, though that would be wonderful to Mr. Keener's morale. The ultimate function of rehabilitation was to make someone as functional as they could be within the limitations that they have. At the time of his deposition, Dr. Adams had not had the benefit of the neuropsychology evaluation, which he had at trial. He was surprised by the extent of the deficits that it showed. He felt it would be very, very difficult for Keener to ever be competitively employed because of the extent of his cognitive disabilities as shown by the evaluation. Dr. Adams still recommended the cognitive rehabilitation program though; as medical director of the rehabilitation program, he was a passionate believer in rehabilitation.
On redirect, Dr. Adams discounted Mr. Keener's smoking as a cause for the stroke. He noted that smoking causes many of the disease processes that cause stroke, like arterial disease, cerebral vascular disease, and cardiac disease, but all Mr. Keener's tests were negative for those conditions. He discounted smoking as a cause of the stroke.
At the close of plaintiffs' case, the defendants moved for a directed verdict, arguing that the plaintiffs failed to present evidence that the stroke was causally related to the lumbar surgery. Defense counsel countered that Dr. Adams testified at length regarding the causal link, and that defendant's own neurologist, Dr. Wilensky, related the stroke to the surgery. The court denied the motion, finding that a jury could find, based upon the evidence and the testimony, that there was a connexity between the two.
As this court recently stated in Reed v. Columbia/HCA Information Systems, Inc., 00-18 (La.App. 5 Cir. 4/11/01), 786 So.2d 142:
A motion for a directed verdict is a procedural device available in trials by jury with an eye toward judicial economy. *362 The motion is appropriately made at the close of the evidence offered by the opposing party and should be granted when, after considering all of the evidence in the light and with all reasonable inferences most favorable to the movant's opponent, it is clear that the facts and inferences point so overwhelmingly in favor of granting the verdict, that reasonable jurors could not arrive at a contrary result. However, if there is evidence produced in opposition to the motion that has such quality and weight that reasonable and fair-minded men, exercising impartial judgment, might reach different conclusions, then the motion should be denied and the case should be submitted to the jury.
The trial court has much discretion in determining whether or not a motion for a directed verdict should be granted. (Cites omitted.)
The trial judge did not err in denying the defendants' Motion for Directed Verdict. The medical evidence presented stated that there was a causal link between the surgery and stroke, an opinion that was shared by the defendants' own expert neurologist Dr. Wilensky. Defendants argue in brief that Dr. Adams's opinion was founded upon faulty and improper methodology and use of differential diagnosis, a position with which we disagree, as discussed above. The defense was able to vigorously cross examine Dr. Adams on the basis for his opinion, and was able to highlight to the jury any deficiencies in his diagnosis and opinion. At this point in the case, the evidence supported a finding that the surgery and stroke were causally related. As such, the evidence did not point, overwhelmingly or otherwise, to the conclusion that the surgery and stroke were not related.
The defendants presented the testimony of Dr. Henry Eiserloh, an expert orthopedic spine surgeon. Dr. Eiserloh testified that he felt Keener's disc herniation was not caused by the accident, based upon the differences in the two MRIs and Mr. Keener's medical history. Dr. Eiserloh did not offer any opinion regarding causation of Mr. Keener's stroke.
Considering the medical evidence presented, we find no manifest error in the jury's conclusion that Mr. Keener's stroke was causally related to the lumbar surgery. The jury had ample expert testimony to consider and clearly credited the testimony and conclusions of Dr. Adams, with the concurring opinion of Dr. Wilensky, who examined the plaintiff for the defense. Having found that Dr. Adams's testimony was admissible under Daubert and Foret, and that the plaintiffs' evidence regarding the stroke met the initial burden of proof, we note that the defendants did not introduce any evidence to the contrary. Drs. Altman, Murphy, and Schuhmacher, experts in their fields with years of experience, found that Keener's herniated disc was caused by the motor vehicle accident in December of 1998. The defendants' expert, Dr. Eiserloh, did not address the stroke in his testimony. Ultimately, it was up to the jury to determine the weight to give all of the testimony and evidence, and we decline to disturb this finding of fact.

LOSS OF CONSORTIUM AWARD
The defendants contend that the jury awarded excessive damages to Julie Keener, $200,000.00, for loss of consortium. A claim for loss of consortium includes seven elements: loss of love and affection; loss of society and companionship; impairment of sexual relations; loss of performance of material services; loss of financial support; loss of aid and assistance; and loss of felicity. Ferrell v. Fireman's Fund Ins. Co., 96-3028 (La.7/1/97), 696 So.2d 569. To be compensable, it is *363 not necessary that a loss of consortium claim include damages from each category. Seagers v. Pallet, 95-52 (La.App. 5 Cir. 5/10/95), 656 So.2d 700. The successful claimant for loss of consortium damages has to prove three things: the liability of the defendant, his or her spouse's damages, and his or her consequent loss of consortium damages. Peck v. Wal-Mart Stores, Inc., 96-645 (La.App. 3 Cir. 11/6/96), 682 So.2d 974. As with general damages, the trier of fact is given much discretion in its deliberations concerning awards for loss of consortium.
Julie Keener was emotional on the stand, weeping at intervals in her testimony. She testified that Ernie Keener has always been a hardworking man who cared about his customers and loved his job. He has always worked installing auto glass as long as she knew him. She married him in August of 1986, six months after they met. They lived in Metairie 13 years before they moved to Slidell, and continued to run their auto glass business from their home. The couple has two children: Jillian, who was 11 at the time of trial, and Jordan, who was 10.
Prior to December 21, 1998, Mrs. Keener described Mr. Keener as a healthy, normal, active man who seldom saw a doctor. The only injuries she remembered were minor cuts from the glass. He never was a complainer and still wasn't, even now after the accident. Before the accident, Julie testified that Ernie never missed work except for scheduled doctor's appointments.
The evening of the accident, Julie said Ernie had a severe headache and was nauseated. Ernie complained of headache, neck, and back pain. After seeing numerous doctors, Keener had back surgery on January 27, 2000, with Dr. Schuhmacher. He was discharged the next day, and he was fine, she testified. He followed the doctor's post-operative instructions. Eight days later he suffered the stroke. She and Ernie were watching TV when he became incoherent, mumbling. She helped him to the floor so he wouldn't hurt himself, and then called 911 and her parents, who lived down the street. Ernie said he had a very bad headache on the right side, and kept pointing to the right side of his head. The ambulance took him to Slidell Memorial Hospital, where he stayed until the next day, until she could get him transferred to East Jefferson Hospital.
Julie described Ernie's condition after the stroke. He couldn't move because he was totally paralyzed. He couldn't swallow or eat, and he couldn't see out of his left eye, or talk. She stayed with him while he was in rehabilitation at East Jefferson, because he could not be left alone. He was scared and so was she. When the children first saw him, about a week after the stroke, they got in bed with him and cried.
When he left the rehabilitation unit, Mrs. Keener said that he could walk, but had to use a cane and a brace on his left foot. He was very slow. He could talk and eat again, and the vision had returned to his left eye. He slept most of the time. After he was discharged from EJ, he received outpatient therapy in Slidell. The therapy consisted of speech, physical, and occupational therapy. His therapy ended in March of 2001. He currently uses a treadmill and an exercise bike. He didn't use a cane anymore, and could take a shower by himself. She said that he'd come a long way, but there were still many things he couldn't do on his own. He couldn't dry himself off, or tie shoes with skinny laces. He couldn't cut his food; she had to do that every day. She had to give him his daily medicine, because he didn't know which ones to take. She testified that he was depressed and cried a lot, *364 and was devastated by what had happened to him.
Julie testified that after the accident, she tried her best to keep the business going. Their employee Jerry did everything he could, until he was too stressed and exhausted and quit around July of 2000. They finally had to close the business right after that.
In July of 2000, Ernie was going to take his drivers test when he suffered a seizure. She described how frightening the seizure was to watch. She thought he was having another stroke. Her daughter witnessed a seizure and thought her father was going to die. At the time of trial, he'd had four seizures.
Ernie's injuries affected their relationship a great deal, because she was the primary caregiver now, which was very stressful on her. She often felt that there was not enough time in the day to do everything. Ernie's memory was affected a great deal. It was frustrating for her to deal with all the ramifications, which ranged from him leaving faucets on in the house to him repeatedly asking the same question of her, because he forgot her answer. She was frustrated when she remembers the person he used to be. She would leave him at home alone when she had no choice, but not for long periods of time. He couldn't take phone messages, because he couldn't hold the phone and write down a message. Before the stroke, Ernie did all the outside work at their home, and any inside work she needed help with.
Julie testified that it was hard for her to see the stress on the children and how afraid they are now. Her emotional health held for about six weeks following the stroke, and then she became very depressed and cried all the time, feeling like there was no hope. She tried anti-depressants, but had too many negative side effects, so she only took Xanax occasionally. She wept when she testified that the one thing she wanted most was her husband back and that she would never get that.
Plaintiffs' brief highlights the testimony of Dr. Kevin Bianchini, the neuropsychologist who evaluated Mr. Keener to determine the extent of his neurological deficits and brain damage resulting from the stroke. Dr. Bianchini administered a comprehensive battery of around 30 tests, including several additional tests to determine if Mr. Keener was using his full effort (which he was, the doctor found). Dr. Bianchini noted that prior to the accident, Keener had completed his education to the tenth grade of high school. He testified that Keener's I.Q. is now in the borderline mentally retarded range, with his math skills at second grade level. Dr. Bianchini said that the plaintiff has significant impairments in his ability to process visual information. Keener scored from borderline to severely impaired range on concentration; he has persistent left-sided upper extremity motor problems; is impaired in visual new learning/visual short-term memory; has moderate to severe impairments in higher cognitive functioning tasks; and has organic denial syndrome, which causes his tendency to deny his problems in general. Dr. Bianchini testified that the plaintiff is unable to fully realize the extent of his impairments. Keener's emotional abilities are also affected, causing him to react to situations in an emotionally inappropriate manner. Dr. Bianchini felt that the plaintiff would probably never return to employment where safety was an issue, and would have a hard time functioning in any job that involves visual processing or visual functioning. Dr. Bianchini expressed doubt that plaintiff would return to competitive employment, and felt that even sheltered employment was not certain. Mr. Keener's *365 lasting deficits support the jury's findings that Mr. and Mrs. Keener's relationship underwent drastic, serious changes following his stroke.
Though the jury's award of $200,000.00 for loss of consortium is relatively high, it is not an abuse of discretion. The Keeners are young; Mr. Keener is not likely to improve a great deal, even with the recommended special therapy. Due to their relatively young age, Mrs. Keener's role in her husband's daily care will likely not diminish and is one she will have to perform for many years. Their relationship has been forever changed by the results of Mr. Keener's stroke.
Substantial loss of consortium awards in similar circumstances are not without precedent in Louisiana. In Oxley v. Sabine River Authority, 94-1284 (La.App. 3 Cir. 10/19/95), 663 So.2d 497, the Third Circuit affirmed a loss of consortium award of $500,000.00 to Mrs. Oxley. Her husband suffered severe injuries, leaving him totally blind. He lost one leg and the other was without feeling, leaving him with a disability rating of 93%. Their relationship changed from husband/wife to patient/nurse.
The evidence in this case shows that Mr. Keener is not as severely affected as Mr. Oxley, and neither is the marital relationship. This case is similar to Moore v. Safeway, Inc., 95-1552 (La.App. 1 Cir. 11/22/96), 700 So.2d 831. Mr. Moore sustained serious and permanent brain damage as a result of a fall from scaffolding, in addition to other physical injuries. His doctor testified that his brain damage left him with many permanent deficits and impairments, and seizures. His wife was his major caretaker after the accident, testifying in detail about the disruption to their lives and the change in their relationship. The court of appeal affirmed the jury's award of $200,000.00 to Mrs. Moore for loss of consortium.
In Accardo v. Cenac, 97-2320 (La.App. 1 Cir. 11/6/98), 722 So.2d 302, a spouse on appeal was awarded $150,000.00 for loss of consortium as the "lowest reasonable" award; plaintiff spouse sustained irreversible and progressive neurological injury though the administration of an neuroleptic drug that left her totally and permanently disabled. The court concluded that the husband/wife relationship underwent an extreme and detrimental change.
We find that the jury did not abuse its vast discretion in this award.

PLAINTIFF'S ANSWER TO APPEAL COLLATERAL SOURCE RULE
The plaintiffs argue that the trial court erred in granting Mid-Continental a credit of $100,869.46 for medical expenses incurred by Mr. Keener, but paid directly by Blue Cross and/or written off by the providers. The credit had the effect of allowing the Keeners to recover only those past medical expenses that they directly incurred, like deductibles and out-of-pocket expenses. For the following reasons, we agree.
The plaintiffs' contract with Blue Cross contains the following provision, printed below in its entirety:
O. Subrogation
1. To the extent that Benefits for Covered Services are provided or paid under the Contract, the Company will be subrogated and will succeed to the right of the Member for the recovery of the amount paid under the Contract against any person, organization or other carrier except where such carrier provides Benefits directly to a Member who is its insured. The acceptance of such Benefits hereunder will constitute such subrogation.

*366 2. The Member will reimburse the Company for all amounts recovered by suit, settlement, or otherwise, from any third party or his insurer to the extent of the Benefits provided or paid under the Contract. The right of reimbursement to the Company exists to the extent allowed by law even if the payment received by the Member is for, or is described as for, his damages other than health care expenses, or if the Member the money is a minor. All costs (including attorney fees) incurred by the Member in exercising any such right of recovery will be the responsibility of the Member. Any amount paid by the Company for which any third party or insurer is responsible will not be reduced by the amount of the Member's costs. (Emphasis added.)
3. The Member will take such action, furnish such information and assistance, and execute such papers as the Company may require to facilitate enforcement of its rights, and will take no action prejudicing the rights and interest of the Company under the Contract.
Under paragraph 2 of this section in the contract with Blue Cross, the plaintiffs are obligated to reimburse Blue Cross for all benefits provided or paid under the contract, if the plaintiffs recover any amounts in a suit, settlement, or otherwise. This obligation to reimburse Blue Cross exists even if the plaintiffs do not recover monies earmarked as "medical expenses" in a suit or settlement. Granting the defendants a credit for the medical expenses paid by Blue Cross puts the plaintiffs in the position of having to reimburse Blue Cross for medical expenses from the remainder of their judgment, a situation that is untenable. Therefore, we reverse the judge's ruling that granted the defendant a credit for past medical expenses paid directly by Blue Cross and/or written off, and amend the judgment, awarding the plaintiffs the entire amount of past medical expenses of $112,604.00.
The judgment of the trial court is affirmed, with the exception of the award for past medical expenses, which is amended to $112,604.00. Costs of this appeal are taxed to the defendants.
AFFIRMED AS AMENDED.
NOTES
[1] Past pain and suffering of Ernest Keener, Jr.: $150,000.00; future pain and suffering: $200,000.00; past medical expenses: $112,604.00; future medical expenses: $66,302.00; past lost wages: $51,422.00; and future lost earning capacity: $307,536.00; for a total of $887,864.00.
[2] Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).
[3] In their answer, plaintiffs also argued that the jury's award of general damages to Ernest Keener was abusively low. However, plaintiffs did not brief this Assignment of Error; therefore, it is considered abandoned. See Rule 2-12.4 of the Uniform Rules of the Courts of Appeal.
[4] 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).
[5] 628 So.2d 1116 (La.1993).
[6] Dr. Wilensky did not testify, but his report was introduced during Dr. Adams's testimony.
[7] Dr. Gaupp, a doctor in Dr. Altman's office, treated Mr. Keener, but was unavailable to testify. Dr. Altman testified regarding Keener's treatment at his office. He was accepted as an expert without cross examination on his qualifications.
[8] Dr. Schuhmacher was accepted as an expert, with the defense waiving cross examination as to his qualifications.
[9] The defense declined to cross examine him on his qualifications.
[10] The defense accepted Dr. Adams as an expert without cross examination on his qualifications.