STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

10-1460

JERRY WAYNE BENOIT

VERSUS

TURNER INDUSTRIES GROUP, LLC

**********

APPEAL FROM THE
OFFICE OF WORKERS' COMPENSATION - # 3
PARISH OF CALCASIEU, NO. 06-06963
SAM L. LOWERY, WORKERS' COMPENSATION JUDGE

**********

ULYSSES GENE THIBODEAUX
CHIEF JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Sylvia R. Cooks, and John D. Saunders, Judges.

AFFIRMED.

B. Scott Cowart
Sammie Maurice Henry
Taylor, Wellons, Politz & Duhe, APLC
7924 Wrenwood Boulevard - Suite C
Baton Rouge, LA 70809
Telephone: (225) 387-9888
COUNSEL FOR:
    Defendant/Appellant - Turner Industries Group, LLC

Charles B. Cappel
Baggett, McCall, Burgess, Watson & Gaughan
P. O. Drawer 7820
Lake Charles, LA 70605-7820
Telephone: (337) 478-8888
COUNSEL FOR:
    Plaintiff/Appellee - Jerry Wayne Benoit

**THIBODEAUX, Chief Judge.**

This is a workers' compensation case. The employer, Turner Industries, appeals a judgment in favor of the plaintiff's widow, Marlene Benoit, which awarded indemnity benefits as well as penalties and attorney fees in connection with Jerry Wayne Benoit's development of acute myeloid leukemia (AML) caused by exposure to benzene.

In awarding benefits to Mrs. Benoit, the Workers' Compensation Judge (WCJ) found a causal link between Mr. Benoit's exposure to benzene in the workplace and AML.

Turner appeals. For the reasons below, we affirm the judgment.

## I.

## ISSUES

We must decide whether:

(1)    the trial court erred in admitting the testimony of the plaintiff's expert witnesses, Dr. Frank Gardner and Frank Parker;

(2)    the trial court erred by concluding that Mrs. Benoit met her burden of proof in establishing a causal link between Mr. Benoit's illness and his employment;

(3)    the trial court erred in awarding penalties and attorney fees to Mrs. Benoit; and,

(4)    the trial court erred in finding that medical expenses were due and owing in the amount of $625,168.27.

## II.

## FACTS AND PROCEDURAL HISTORY

Mr. Benoit worked for Turner as a laborer for twenty-seven years. From 1979 to 1989, he worked primarily at the CITGO refinery in Lake Charles,

Louisiana.[1] CITGO contracted with Turner to perform routine maintenance at the facility such as cleaning the chemical muck, oily waste and chemical batch discharges that accumulated in the sewers, ditches, and sump collection points throughout the processing units. As a general laborer, Mr. Benoit's duties included performing these clean-up operations. Consequently, Mr. Benoit was routinely exposed to the chemicals that collected in these areas. One chemical commonly found at the CITGO facility and other similar facilities is benzene. Facilities such as CITGO frequently monitor their employees for benzene exposure.[2] Mr. Benoit became ill in July 2006. He was diagnosed with AML shortly thereafter. Mr. Benoit requested compensation from Turner under the Workers' Compensation Act, alleging that he developed AML because of his exposure to benzene during his employment with Turner at CITGO. Turner refused Mr. Benoit's claim, and Mr. Benoit filed the underlying lawsuit. After his death, Mr. Benoit's lawsuit was amended to a workers' compensation benefits claim for Mrs. Benoit.

After an almost four year delay,[3] the matter was tried by the OWC. At trial, the WCJ heard both deposition and live testimony from Mr. Benoit and from his co-workers and family. The WCJ also heard testimony from two experts for the plaintiff and one expert for the defense. Mr. Frank Parker, an industrial hygienist, testified about the risks of overexposure to benzene, operations at facilities such as CITGO, and symptomatic evidence of overexposure to benzene. Mr. Parker opined that Mr. Benoit received significant exposure to benzene while working at CITGO.

---

[1] The CITGO facility was previously known as Cities Service. For consistency, we refer to the facility as CITGO throughout this Opinion.

[2] Neither CITGO nor Turner maintained monitoring records for Mr. Benoit.

[3] We attribute much of the unconscionable delay to Turner, who was less than forthcoming in providing documentation to which Mr. Benoit was legally entitled to have. Specifically, Turner was inexplicably unable to provide evidence documenting the quantity and duration of the benzene levels to which Mr. Benoit was exposed.

2

Dr. Frank Gardner, an oncologist and hematologist, testified about the effects of inhalation and dermal absorption of benzene and the causal link between benzene and AML. Dr. Gardner opined that Mr. Benoit's AML was more likely than not caused by overexposure to benzene.

Dr. William Nasetta testified on behalf of Turner. Dr. Nasetta testified that simply showing exposure to benzene, with no information on the amount and duration of exposure, cannot lead to any reliable opinion on a causal link between benzene and AML because other causes of AML exist. Moreover, Dr. Nasetta opined that Mr. Benoit's AML is likely not the type associated with benzene exposure because Mr. Benoit had no evidence of the chromosomal abnormalities associated with benzene exposure linked to AML.

In addition to the expert witnesses, the WCJ heard testimony from several lay witnesses including the preservation deposition testimony of Mr. Benoit before his death, the testimony of Mr. Benoit's co-workers, and the testimony of Mr. Benoit's wife and daughters. All of the lay witnesses provided similar testimony about the deplorable conditions in which Mr. Benoit worked, the physical effects Mr. Benoit suffered as a result of his work, and the condition of his appearance when he returned home from work.

After reviewing the matter, the WCJ awarded indemnity benefits as well as penalties and attorney fees to Mrs. Benoit. It is from that judgment that Turner appeals.

III.

**LAW AND DISCUSSION**

**Standard of Review**

We review the trial court's factual judgments for manifest error.

3

> [A] court of appeal may not set aside a trial court's
> or a jury's finding of fact in the absence of "manifest error"
> or unless it is "clearly wrong," and where there is a conflict
> in the testimony, reasonable evaluations of credibility and
> reasonable inferences of fact should not be disturbed upon
> review, even though the appellate court may feel that its
> own evaluations and inferences are as reasonable.

*Rosell v. ESCO*, 549 So.2d 840, 844 (La.1989) (citations omitted).

Moreover, we review a trial court's decision to accept the testimony and methodologies employed by an expert under the abuse of discretion standard. *Chearis v. State Dep't. of Transp. and Dev.*, 03-0680 (La. 12/3/03), 861 So.2d 536.

### Expert Witness Qualifications

Turner asserts that the WCJ erred by admitting the testimony of Mr. Benoit's two expert witnesses, Frank Parker and Dr. Frank Gardner. Turner challenged the admissibility of the two plaintiff experts in a *motion in limine* and renewed those objections during trial.[4] Specifically, Turner alleges that Mr. Parker relied on "old" data and did not employ a scientific methodology in reaching his conclusion that Mr. Benoit was exposed to dangerously high levels of benzene. Because Dr. Gardner based his opinion on Mr. Parker's findings and, because in Turner's opinion, Dr. Gardner also used "old" data, Turner reasons that admission of his testimony was erroneous, as well. Instead, Turner urges that its expert, Dr. William Nasetta, possessed superior data and superior methodology and should have been the only expert allowed to testify. We disagree with Turner's position.

Admissibility of expert testimony in Louisiana is governed by La.Code Evid. art. 702, which provides as follows:

---

[4]Mr. Benoit argues on appeal that Turner's objections should have been limited to its *motion in limine* to exclude the experts, which was denied by the trial court and that Turner's later *Daubert* objections at trial were belated and therefore improper. While this may be true, we note that Mr. Benoit's counsel did not object at trial. Moreover, this point is moot because we find that the trial court did not abuse its discretion in admitting Mr. Benoit's experts.

4

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

A district court has broad discretion in whether or not an expert's testimony is admissible and who should or should not be permitted to testify as an expert. *Chearis,* 861 So.2d 536.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786 (1993), the United States Supreme Court developed a new standard to assist district courts in evaluating the admissibility of expert testimony. The *Daubert* court established several non-exclusive factors for considering the admissibility of expert testimony:

> (1) The "testability" of the scientific theory or technique;
>
> (2) Whether the theory or technique has been subjected to peer review and publication;
>
> (3) The known or potential rate of error; and
>
> (4) Whether the methodology is generally accepted in the scientific community.

*Chearis*, 861 So.2d at 541.

"Moreover, determination of the admissibility of expert testimony under La.Code Civ.P. art. 702 'turns upon whether it would assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Chearis*, 861 So.2d at 541-42 (quoting Official Comment (c)). The party challenging the admissibility of the expert witness has the burden of proving that *Daubert* factors were not met.

### *(1) Mr. Frank M. Parker*

At trial, Mr. Benoit introduced the deposition of Frank Parker, who is qualified as an expert in industrial hygiene, the science devoted to the determination

of exposure levels in the workforce to substances including carcinogens such as benzene.  Mr. Parker has significant experience in this field.  He worked as an industrial hygienist for two large refineries, and he testified at trial in eleven cases involving benzene, qualifying as an expert in all cases where he testified.  Moreover, Mr. Parker is extremely familiar with the CITGO facility where Mr. Benoit worked. Having previously inspected the CITGO facility, Mr. Parker applied to his analysis his personal knowledge of the facility, his work experience as an industrial hygienist, and his personal knowledge of the many industrial hygiene studies performed by CITGO regarding benzene exposure at the CITGO facility.

Mr. Parker based his expert exposure opinion on credible factual accounts from witnesses, including Mr. Benoit, and on internal CITGO memoranda. Contrary to Turner's contention, Mr. Parker's expert opinion was not based on conjecture and speculation, but rather on years of direct experience and known factual data.  This factual information included:  (1) descriptive accounts from Mr. Benoit regarding his work conditions at CITGO; (2) descriptive accounts from Mr. Benoit's co-workers regarding the work conditions at CITGO; and, (3) numerous internal CITGO memoranda regarding long-term benzene exposure problems at the facility.

Mr. Parker opined that Mr. Benoit's work duties at CITGO exposed him to hazardous levels of benzene.[5]  In doing so, Mr. Parker employed a methodology of drawing on his own experience, analyzing witness testimony, and evaluating internal CITGO memoranda.  Despite challenging the admissibility of Mr. Parker's testimony and questioning the methodology employed, Turner fails to offer any

---

[5]Turner argues that Mr. Parker's expert opinion regarding Mr. Benoit's benzene exposure levels are unreliable because it is not supported by individual or area monitoring records.  This court notes, as did the WCJ, that Mr. Benoit's counsel requested monitoring records from Turner on numerous occasions.  Turner was unable to produce monitoring records for Mr. Benoit.  Thus, Mr. Parker was forced to rely on his years of experience, factual accounts from Mr. Benoit and his co-workers, and numerous internal memoranda regarding benzene exposure at CITGO to formulate his expert opinion that Mr. Benoit was exposed to significant and hazardous levels of benzene.

evidence that the methodology employed by Mr. Parker is unreliable and incorrect. Instead, it merely states repeatedly that the methodology employed by its expert, Dr. Nasetta, is reliable and correct. Turner's position is nothing more than a "battle of the experts" argument. Simply because Turner believes its expert is "right" does not amount to an abuse of discretion by the WCJ in admitting the testimony of Mr. Parker. Thus, we find that the trial court did not abuse its discretion in admitting the testimony of Mr. Parker.

### (2) Dr. Frank Gardner

Similarly, Turner challenges the WCJ's admission of Dr. Frank Gardner's expert testimony. Turner reasons that because Dr. Gardner based his opinion on Mr. Parker's findings and because, in its opinion, Dr. Gardner did not employ a proven methodology in reaching his findings, Dr. Gardner's testimony should have been excluded. We disagree.

Dr. Gardner is a medical doctor qualified as an expert in the fields of oncology and hematology. Dr. Gardner has had extensive training and experience in these fields over the course of fifty-five years. Dr. Gardner has written and collaborated on numerous peer-reviewed articles, papers, and book chapters on the subjects of oncology and hematology. Moreover, Dr. Gardner has testified as an expert in oncology and hematology in numerous cases involving occupational exposure to benzene.

Here, Dr. Gardner opined that Mr. Benoit's occupational exposure to hazardous concentrations of benzene was more likely than not the cause of Mr. Benoit's AML, which caused his death. To reach this conclusion, Dr. Gardner utilized his personal experience and knowledge gained from similar benzene exposure cases, and he methodically evaluated a variety of evidence including: (1) descriptive

7

evidence of Mr. Benoit's duties as a laborer at CITGO; (2) Mr. Benoit's medical records; (3) cytogenetic measurements; (4) witness testimony regarding the conditions of the CITGO facility; (5) Mr. Parker's expert opinion that Mr. Benoit was exposed to hazardous levels of benzene; (6) numerous internal CITGO memoranda concerning long-term benzene exposure problems at CITGO; and, (7) medical literature and studies regarding occupational exposure to benzene.

Turner belabors the same points it made regarding Mr. Parker's testimony. Specifically, Turner argues that Dr. Gardner's testimony was unreliable because, in its opinion, the methodology and studies relied on by Dr. Gardner were "old" and "outdated." Turner states that the WCJ should have instead relied on the methodology and studies of its expert, Dr. Nasetta. Again, Turner's argument boils down to a "battle of experts" and does not lead to a finding of abuse of discretion. Moreover, Turner argues that the type of AML suffered by Mr. Benoit—type M6—could not be caused by benzene exposure, as opined by Dr. Gardner. Turner's own expert, however, admitted that type M6 AML could be caused by overexposure to benzene. Finally, Turner relies on its fall-back position that because Dr. Gardner based his opinion, in part, on Mr. Parker's findings, Dr. Gardner's testimony is inadmissible. Because we find that the WCJ did not abuse its discretion in admitting the testimony of Mr. Parker, Turner's argument is without merit.

Thus, after thoroughly reviewing the evidence and testimony presented, we find no abuse of the WCJ's wide discretion in its determination to accept the expert testimony of Mr. Parker and Dr. Gardner.

**Mrs. Benoit's Burden of Proof**

Turner asserts that the WCJ erred in concluding that Mrs. Benoit met her burden of proving that her husband's M6 AML was related to benzene exposure at

CITGO. The WCJ's findings of fact are reviewed under the "manifest error" or "clearly wrong standard." *Dean v. Southmark Const.*, 03-1051, p. 7 (La. 7/6/04), 879 So.2d 112, 117. We cannot disturb the WCJ's findings of fact as long as they are reasonable and supported by the record. *Id.* The WCJ's findings as to whether the claimant has met his burden of proof are factual and cannot be disturbed on review unless clearly wrong or manifestly erroneous. *Stutes v. Koch Services, Inc.*, 94-782, p. 4 (La.App. 3 Cir. 12/7/94), 649 So.2d 987, 990, *writ denied*, 95-846 (La. 5/5/95), 654 So.2d 335.

In analyzing causation, "[t]he initial question is factual, i.e. whether the plaintiff sustained an occupational disease resulting from causes and conditions characteristic of and peculiar to his particular occupation, process, or employment." *Stutes*, 649 So.2d at 990. The plaintiff need not prove the causal connections with absolute certainty but instead must only show the cause of his illness or disability with reasonable certainty. *Id.*

In this case, the WCJ found Mrs. Benoit had proven by a preponderance of the evidence the causal relationship between her husband's disease and his employment.

The WCJ first considered the testimony of all testifying experts in the case—Dr. Frank Gardner, Mr. Frank Parker, and Dr. William Nasetta. Dr. Gardner, relying on the expert opinion of Mr. Parker as well as other data, concluded that Mr. Benoit's illness was more likely than not caused by Mr. Benoit's exposure to hazardous levels of benzene while employed by Turner at the CITGO facility. Though Dr. Gardner never personally examined Mr. Benoit, for the obvious reason that Mr. Benoit was deceased, he relied on the information provided to him about Mr. Benoit's work, as well as his own knowledge about the effects of overexposure to benzene, to detail the causal connection between the chemicals and the leukemia.

9

Specifically, Dr. Gardner discussed in detail the significant exposure to benzene that would most likely occur when an individual was engaged in the work of cleaning out sewers, pumps, and ditches at a chemical plant. Dr. Gardner pointed out that Mr. Benoit likely both inhaled benzene and absorbed it through the skin.

Dr. Gardner explained that strong scientific evidence suggests that intermittent high levels of benzene enhance the risk of leukemia. Dr. Gardner repeatedly stressed that all of the factors involved, including the type of work, type of environment, and type of climate, combine to make it more probable than not that Mr. Benoit's AML was caused by overexposure to benzene.

The WCJ also carefully considered Mr. Parker's testimony. Mr. Parker explained that the scientifically-accepted peak standard for benzene is five parts per million. Any exposure beyond that level fosters concern. He noted that an individual can smell benzene when its concentration reaches sixty parts per million, and symptomatic responses to benzene, such as headaches, nausea, and dizziness, all symptoms exhibited by Mr. Benoit, start around one thousand parts per million. When asked directly, Mr. Parker unwaveringly concluded that Mr. Benoit more likely than not received significant exposure to benzene.

Mr. Parker explained that he arrived at that conclusion by referring to data that had been gathered by a variety of sources, including the refinery itself, as well as analyzing the testimony regarding Mr. Benoit's physical symptoms prior to becoming ill with AML.

In rebuttal, Turner presented the testimony of Dr. William Nasetta. Dr. Nasetta testified that he could not be absolutely certain as to the exact cause of Mr. Benoit's AML, but he saw no evidence linking Mr. Benoit's illness to benzene. Dr. Nasetta believes that for a physician to prove that benzene exposure in the workplace caused leukemia, the physician must know the rate and length of exposure to the

chemical. Dr. Nasetta proclaimed that he saw no causal link between Mr. Benoit's benzene exposure and his AML, but he could not definitively state that type M6 AML could not be caused by overexposure to benzene.

The WCJ weighed the credibility of the experts and clearly assigned more weight to Dr. Gardner's and Mr. Parker's testimony. Indeed, the WCJ glowingly described Dr. Gardner as "sure-footed" and "unwavering." He stated that Dr. Gardner does not appear to fall into the category of a "hired physician," and he "appeared to concentrate on explaining his views, not merely selling or promoting them." Similarly, the WCJ described Mr. Parker's methodology, research, and reasoning as "even-handed, scholarly, and rational." Moreover, the WCJ stated that "[Dr. Parker's] testimony never created the impression that he was simply broad-siding and blindly attacking the petroleum refining industry." In contrast, while not criticizing Dr. Nasetta directly, the WCJ criticized Turner's defense of the case as "rigid and uncompromising" and as containing a "gap in . . . logic." Clearly, the WCJ found Mr. Benoit's experts to be more credible, and we find no manifest error in that decision.

Moreover, compelling lay testimony buttressed the expert testimony in this case. The WCJ heard testimony from Mr. Benoit's co-workers regarding the disgusting and arguably hazardous conditions he faced at CITGO. The descriptions of the chemical muck and noxious smells he encountered during his employment painted a vivid picture for the WCJ and for us. Similarly, Mr. Benoit's family members testified about the greasy, grimy, and smelly state their husband and father returned home in each day. They testified that he had frequent headaches and dizziness and, on occasion, vomited after returning home from work. Their testimony, too, provided the WCJ with a clear view of Mr. Benoit's working environment. He judged their testimony as credible, and again, we find no manifest

11

error in that determination. The WCJ was not clearly wrong in his determination that Mrs. Benoit established the causation of her husband's occupational disease by a reasonable probability.

**Penalties and Attorney Fees**

Turner next challenges the WCJ's award of penalties and attorney fees in this matter. The WCJ found that Mrs. Benoit was entitled to penalties and attorney fees for Turner's failure to pay indemnity benefits to Mr. Benoit while he was alive and its failure to pay indemnity benefits to Mrs. Benoit following Mr. Benoit's death.

An employer is liable for statutory penalties for withholding benefits without evidence to "reasonably controvert" the employee's right to compensation and medical benefits. La.R.S. 23:1201. Section 1201(B) provides a specific time requirement for the first installment of compensation to be paid. Specifically, it provides that the first installment is due on the fourteenth day after the employer or insurer has knowledge of the claimant's injury or death. We review the WCJ's decision to award penalties and attorney fees under the manifest error/clearly wrong standard. *Scott v. City of Pineville*, 08-1410 (La.App. 3 Cir. 4/1/09), 8 So.3d 813, *writ denied*, 09-981 (La. 6/19/05), 10 So.3d 742.

Here, Turner had countless pieces of evidence to support Mr. Benoit's claim that his AML was caused by his occupational environment. Specifically, in 2006, Mr. Benoit was diagnosed with AML, rendering him disabled. He filed a claim for benefits, which Turner denied. In 2007, his preservation deposition was taken. At his deposition, Mr. Benoit placed Turner on notice of the following facts: (1) he worked in deplorable conditions at CITGO; (2) he was exposed to oil, chemicals, and hazardous waste during his employment; and, (3) he frequently suffered from dizziness and nausea while on the job. At this point, Turner could have begun

12

benefits or made an effort to "reasonably controvert" Mr. Benoit's claim that his illness was linked to his occupational environment. Instead, Turner did nothing. Mr. Benoit died in November 2007. In March 2008, Mr. Frank Parker prepared his expert report and opined that Mr. Benoit was overexposed to benzene while employed by Turner at CITGO. Again, Turner did nothing. One month later, in April 2008, Dr. Frank Gardner prepared an expert report which stated that it was more probable than not that Mr. Benoit's AML was caused by his workplace environment. Turner took no action. On July 15, 2008, Mr. Benoit's co-workers were deposed and corroborated Mr. Benoit's testimony. Shortly thereafter, counsel for Mrs. Benoit provided Turner with hundreds of internal documents from CITGO that further substantiated the evidence of Mr. Benoit's overexposure to benzene. Still, however, Turner paid no benefits to Mrs. Benoit nor did it take any action to "reasonably controvert" Mr. Benoit's claims. Indeed, Turner's expert, Dr. William Nasetta, did not issue his report until October 30, 2008.

The record supports the WCJ's factual determination that Mr. Benoit, and later Mrs. Benoit, provided sufficient factual information to support a claim for workers' compensation benefits. Moreover, the record indicates that Turner took no action to reasonably controvert the claim for benefits. Thus, we find that the WCJ did not manifestly err in awarding penalties and attorney fees in this matter.

**Medical Expenses**

Turner asserts that the WCJ erred in finding that medical expenses were due and owing in the amount of $625,168.27. The WCJ reviewed evidence that Medicaid paid the medical expenses and asserted a lien of $203,124.68. Pursuant to La.R.S. 23:1212(B), payments by Medicaid do not extinguish the claim, and payments are subject to recovery by the state from the employer. Louisiana Revised

Statutes 23:1212(B) does not prevent payment of medical expenses to the claimant. The statute merely limits the parties upon whom the state may assert a claim for the lien amount. Again, it does not dictate to whom the payment should be made. Turner has cited no statutory or codal authority that prevents awarding the full amount of the medical expenses to Mrs. Benoit. Thus, we find that the WCJ's award of $625,168.27 to Mrs. Benoit was not manifestly erroneous and was legally correct.

IV.

## **CONCLUSION**

For the foregoing reasons, we affirm the judgment of WCJ. Costs of this appeal are assessed to Turner.

**AFFIRMED**.