# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## CA 11-724

TYNIRSHA W. RHINE

VERSUS

BAYOU PIPE COATING, ET AL.

**********

APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF IBERIA, NO. 103271
HONORABLE GERARD B. WATTIGNY, DISTRICT JUDGE

**********

**J. DAVID PAINTER
JUDGE**

**********

Court composed of Ulysses Gene Thibodeaux, Billy Howard Ezell, and J. David Painter, Judges.

**AFFIRMED.**

Raymond Morgan Allen
P.O. Box 3204
Lafayette, LA 70502
COUNSEL FOR DEFENDANTS/APPELLANTS:
The Bayou Companies, LLC and the Gray Insurance Company

Morgan J. Wells, Jr.
Ste. 1100, Two Lakeway Center
3800 N. Causeway Blvd.
Metairie, LA 70002
COUNSEL FOR DEFENDANT/APPELLANT:
The Bayou Companies, LLC and the Gray Insurance Company

Kenneth W. Jacques
201 St. Charles Ave.

Suite 4314, Place St. Charles
New Orleans, LA 70170
COUNSEL FOR PLAINTIFFS/APPELLEES
Tynirsha W. Rhine, Individually and On Behalf of the Minor Children, Melvin Rhine, III, and Ty'Nise Latori Rhine and Kendra Johnson on behalf of the minor child, Keyshawn Johnson

Louis R. Koerner, Jr.
P.O. Box 4297
Houma, LA 70361
COUNSEL FOR PLAINTIFFS/APPELLEES
Tynirsha W. Rhine, Individually and On Behalf of the Minor Children, Melvin Rhine, III, and Ty'Nise Latori Rhine and Kendra Johnson on behalf of the minor child, Keyshawn Johnson

**PAINTER, Judge.**

Defendants, the Bayou Companies, LLC (Bayou) and its insurer, the Gray Insurance Company, appeal the judgment of the trial court finding them at fault in connection with the death of their employee, Melvin Rhine, and awarding damages to his wife and children as a result. Finding no error in the trial court judgment, we affirm.

## FACTS

Melvin Rhine, Jr. was killed on July 15, 2003, while performing his regular work duties as a taper for the Bayou Companies, LLC.

In 1999, Bayou contracted with Bauhuis, USA to design, manufacture, and install a pipe coating plant for the purpose of wrapping joints of pipe with concrete to give the pipe negative buoyancy so it could be used underwater. The pipe coating plant was originally designed so that the first section would wrap one inch of concrete around the joint and the second section would impinge, or blow, the remaining inches of concrete onto the joint. After the joints were coated, thick sheet plastic was mechanically wrapped around the joint to hold the wet cement in place during the curing process. Once the plastic was applied to the joints, workers manually applied tape around the plastic to hold it in place during the cement curing process. The joints of pipe moved through the cementing process on a spiral conveyor at the inbound section which rotated the joints and pushed them toward the cement coating process. After the cement was applied, the joints were supported and rotated by five separate belt head conveyors which were spaced approximately 4-5 feet apart. None of the belt head conveyors designed, manufactured, and installed by Bauhuis had side guarding. Installation of the pipe coating plant was complete in January 2000.

Between October 2000 and March 31, 2001, Bayou decided to remove the impingement section and use only the wrap method to apply concrete to the joints of pipe. Bayou supplemented the Bauhuis belt heads with a locally-built belt head copied from the Bauhuis belt heads. After the impingement method was abandoned, taping

was done immediately after the plastic was applied. Rhine died when he was caught between and pulled into the rotating pipe and the belt of the newest belt head conveyor which had been installed by Bayou employees.

Tynirsha W. Rhine, wife of the deceased, filed an intentional tort action against Bayou both individually and on behalf of the minor children, Melvin Rhine, III, and Ty'Nise Latori Rhine. Kendra Johnson brought suit on behalf of Keyshawn Johnson, the deceased's child born of a relationship with her. In addition to Bayou, Plaintiffs named Gray Insurance Company, Bauhuis Group, Bauhuis International, B. V., and B & L Bauhuis, USA, Inc. (collectively Bauhuis) as Defendants.

After a trial on the merits, the trial court rendered judgment in favor of Plaintiffs, apportioning fault 50% to Bayou and the Gray Insurance Company, 50% to Bauhuis, and awarding damages as follows:

| | |
|---|---|
| 1. In favor of Tynirsha Rhine, individually and on behalf of the minor children, Mervin Rhine, III and Ty'Nise Rhine for past loss of support in the amount of $173,006. | $173,006. |
| 2. In favor of Kendra Johnson, on behalf of her minor child, Keyshawn Johnson, for past loss of support in the amount of $20,400. | $20,400. |
| 3. In favor of Tynirsha Rhine, individually and on behalf of the minor children, Melvin Rhine, III and Ty'Nise Rhine for future loss of support in the amount of $946,927. | $946,927. |
| 4. In favor of Kendra Johnson, on behalf of her minor child, Keyshawn Johnson, for future loss of support in the amount of $27,488 from May 1, 2010 until Keyshawn reaches 22 years of age. | $27,488. |
| 5. In favor of Tynirsha Rhine for funeral expenses in the amount of $7,750. | $7,750. |
| 6. In favor of Tynirsha Rhine for loss of consortium in the amount of $500,000. | $500,000. |
| 7. In favor of Tynirsha Rhine on behalf of the minor child, Melvin Rhine, III, for loss of consortium in the amount of $400,000. | $400,000. |

2

| | |
|---|---|
| 8. In favor of Tynirsha Rhine, on behalf of the minor child, Ty'Nise Rhine for loss of consortium in the amount of $300,000. | $300,000. |
| 9. In favor of Kendra Johnson, on behalf of her minor child, Keyshawn Johnson, for loss of consortium in the amount of $300,000. | $300,000. |
| 10. In favor of Tynirsha Rhine for survival damages in the amount of $12,500. | $12,500. |
| 11. In favor of Tynirsha Rhine, on behalf of the minor child, Melvin Rhine, III, for survival damages in the amount of $12,500. | $12,500. |
| 12. In favor of Tynirsha Rhine, on behalf of the minor child, Ty'Nise Rhine for survival damages in the amount of $ 12,500. | $12,500. |
| 13. In favor of Kendra Johnson, on behalf of her minor child, Keyshawn Johnson, for survivor damages in the amount of $12,500. | $12,500. |
| TOTAL AWARD | $2,725,571.00 |

Bayou and the Gray Insurance Company appeal.

## DISCUSSION

*Testimony of Plaintiffs' Expert, Robert Borison*

Defendants assert that the trial court erred in failing to disqualify Plaintiffs' expert, Robert Borison, pursuant to *Daubert v. Merrell Dow Pharmaceuticals. Inc.*, 504 U.S. 579, 113 S.Ct. 2786 (1993), and in allowing him to testify as to Bayou's intent, subjective knowledge, and state of mind with regard to the accident. Defendants argue that the *Daubert* hearing held by the trial court was flawed in that the trial court failed to determine the scientific basis for Borison's opinions.

> A trial judge has wide discretion in determining whether to allow a witness to testify as an expert, and this includes the determination of how much and what kind of education and/or training adequately qualify an individual as an expert, and his judgment will not be disturbed by an appellate court unless it is clearly erroneous. *Abshire v. Wilkenson*, 2001-0075 (La.App. 3 Cir. 5/30/01), 787 So.2d 1158. The court need not determine that the expert testimony a litigant seeks to offer into evidence is irrefutable or certainly correct. *Keener v. Mid-Continent Casualty*, 01-1357, p. 12 (La.App. 5 Cir. 4/30/02), 817 So.2d 347, 354-355[, *writ denied*, 02-1498 (La. 9/20/02), 825 So.2d 1175]. As with all other

admissible evidence, expert testimony is subject to being tested by "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Id.* (citing *Daubert*, 509 U.S. at 596, 113 S.Ct. at 2798). As the jurisprudence indicates, there is a crucial difference between questioning the methodology employed by an expert witness, and questioning the application of that methodology or the ultimate conclusions derived from that application. Only a question of the validity of the methodology employed brings *Daubert* into play.

*Tadlock v. Taylor*, 02-0712, pp. 4-5 (La.App. 4 Cir. 9/24/03), 857 So.2d 20, 26, *writ denied*, 03-3265 (La. 3/12/04), 869 So.2d 819.

At the *Daubert* hearing, counsel for Defendants questioned Borison extensively as to the scientific basis for the opinions set out in his report. After the hearing, the trial court gave the following oral reasons:

[Counsel for Defendant's] point is that the expert, Mr. Borison, has taken no courses which support[ ] his opinion that this accident was inevitable or it was certain to happen or it was intentional. I don't know what courses he could have taken to make that sole statement, okay? The only thing I know of that would provide that, I guess, would be a psychologist because of his experience and his education or a lie detector. Those things direct themselves to truth of a statement, okay? So he hasn't done either of those things.

However, Mr. Borison in this case is an expert witness. His expertise is in safety. His expertise is in accident investigation. His expertise is in guarding equipment, in designing guards for equipment, and in safe operations of equipment in industrial situations. And that's what he's going to testify to in his expertise. Those things certainly, in my opinion, are relevant because, though the Court has a lot of experience in dealing with various kinds of accidents and those kind of things, the Court can be helped by his testimony in regards to the happening of accidents with guards or without guards, happening of accidents at pinch points or not at pinch points. And of course his testimony goes to the fact that – and also his experience with OSHA and safety shows the real problems and difficulties and probabilities of accidents at pinch points.

Now I know probability doesn't satisfy the criteria, okay? And I'm not saying that, if he only establishes probability, he meets the criteria. But I think the study of probability could lead one who deals with those incidents to be able to reach an opinion as to the inevitability of that type of accident happening. And he may know that. And I think he's had sufficient experience and training to know that, because he's designed guards, he's investigated accidents, he's familiar with pinch points, and so that he can relate different types of situations and the danger arising from those situations to an individual because of his experience. That can lead the Court to be able to make the opinion the Court needs to make, if it makes it, of whether the accident was substantially certain to happen or

4

whether it was inevitable, whether it was intentional or whether it was just negligent.

So, though he hadn't taken a specific course to be able to say maybe to give the ultimate opinion, I find that he has the expertise through his training and experience to be able to assist the Court in what's dangerous, what's not dangerous, and how dangerous things are, and his experience in how dangerous they are, related to whether there are guards or no guards and the type of accidents that have happened. So, in that sense, I find that he can express his opinion as an expert in the case. And I find that he's qualified.

The trial court made clear that while it was aware that Borison could not give the ultimate opinion as to whether the accident was substantially certain, it felt that experience and training qualified Borison to give opinions as to what was dangerous and how dangerous the work place was. Given the trial court's determination that the expert testimony would help it understand the evidence or determine a factual issue, we find that the decision to allow Borison to testify was within its wide discretion, especially since this was a bench trial. *See Benoit v. Turner Indus. Group, LLC*, 10-1460 (La.App. 3 Cir. 5/4/11), 63 So.3d 443, *Holzenthal v. Sewerage & Water Bd. Of New Orleans*, 06-796 (La.App. 4 Cir. 1/10/07), 950 So.2d 55, *writ denied*, 07-294 (La. 3/3/0/07), 953 So.2d 71.

*Intentional Tort*

Defendants further assert that the trial court erred in finding that the intentional tort exception to the workers' compensation act was applicable. It is their position that the facts of the case do not rise to the level of an intentional tort. This court recently explained:

If an employee is found to be in the course and scope of his employment when he is injured and the employer invokes the defense of tort immunity, the employee's remaining recourse against his employer is a claim for intentional tort. La.R.S. 23:1033.

The Louisiana Supreme Court in *Batiste v. Bayou Steel Corp.*, 10-1561, pp. 2-3 (La. 10/1/10), 45 So.3d 167, 168-69, discussed the factors involved in proving an intentional act so as to escape the coverage of the workers' compensation act.

5

> In order to recover in tort against Bayou Steel under La. R.S. 23:1032(B), plaintiffs must prove Mr. Batiste's injury resulted from an "intentional act." In *Bazley v. Tortorich*, 397 So.2d 475 (La.1981), we explained an intentional act requires the actor to either 1) consciously desire the physical result of his act, whatever the likelihood of that result happening from his conduct; or (2) know that the result is substantially certain to follow from his conduct, whatever his desire may be as to that result.

*Hebert v. Richard*, 10-1417, p. ___ (La.App. 3 Cir. 7/6/11), ___ So.3d ___, ___. Here, as in Batiste, Plaintffs do not allege that Bayou consciously wanted to cause harm to the deceased. Rather, they assert that the deceased's injuries were substantially certain to follow from Bayou's conduct.

Although Defendants assert that Bayou's conduct does not rise to the level of an intentional tort as a matter of law and that the trial court committed legal error, we must apply a manifest error standard of review.

> Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The appellate review of fact is not completed by reading only so much of the record as will reveal a reasonable factual basis for the finding in the trial court, but if the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous. When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact's findings. *Rosell v. ESCO*, 549 So.2d 840, 844 (La.1989).

*Robinson v. N. Am. Salt Co.,* 02-1869, pp. 8-9 (La.App. 1 Cir. 6/27/03), 865 So.2d 98, 105, *writ denied*, 03-2581 (La. 11/26/03), 860 So.2d 1139.

The trial court first reviewed the law with regard to the application of the intentional tort exception to the exclusive remedy rule of the Louisiana Worker's Compensation Act, noting that:

> [A]ll of the negligence which was brought out in the trial of the Manager and Safety Personnel of the cement plant at Bayou is not relevant to recovery under the intentional tort exception of the Compensation Act. There is a substantial amount of evidence which would support

negligence and even gross negligence, however, which is not satisfactory to come within the intentional tort exclusion of the Compensation Act.

The court then outlined the testimony and evidence as well as its reasons for ruling on the intentional tort question, in written reasons for judgment, as follows:

On August 10, 2001, Curley Gilliam was a taper at the cement plant on the conveyor system. . . . He had been using the taping process since the beginning of this operation. He was holding a roll of tape in his hand and was applying tape with his hand to the visqueen on the turning pipe and allowing the tape to come off of the roll of tape and onto the visqueen on the turning pipe. There was another person taping the opposite side of the pipe. Gilliam was standing on the south side of the pipe with the pipe rotating away from him from bottom to top. The accident to Curley Gilliam occurred when the taper on the opposite side of the pipe had the tape slip out of his hand while he was attempting to tape the pipe and the loose tape wrapped around the wrist of Curley Gilliam on the opposite side of the pipe. Curley Gilliam was pulled over the rotating pipe by the tape and turning pipe. As he was pulled over the turning pipe, however, his foot hit the safety trip wire, which was located about a foot above the turning pipe. When he hit the safety trip wire, that turned off the conveyor and the pipe stopped turning and Curley Gilliam fell to the ground, but was otherwise not seriously injured. He did not fall into any pinch point created by the belt heads, rubber belts and turning pipe. However, in the taping process, he was caught by the tape of the opposite side taper and pulled over the turning pipe as he attempted to tape. The supervising personnel at Bayou had a safety meeting every morning at the cement plant before they began operations. It became a common story at the safety meetings for persons to be careful about putting their hands onto the turning pipe or near the conveyor or pinch points. It was often used as an example, the Curley Gilliam incident, in which the employees were warned to be very careful in working around the turning pipes so the same thing would not happen to them. The Curley Gilliam incident was used as an example by the Safety Director, David Bourgeois, and by the Plant Manager, Bobbie Boffone, and others.

After the Curley Gilliam incident, Bobbie Boffone, Tom Moncla and others in the cement plant began giving consideration to the installation of guards on the belt heads and conveyor system in order to protect against the type of accident of the taper, Curley Gilliam. They realized the hazardous nature of the conveyor system and the taping process by the tapers using their hands to place the tape onto the pipe and being in the vicinity of the turning pipe and belt heads and conveyor pulleys. As a result thereof, particularly Tom Moncla looked at and considered the installation of guards. Bobbie Boffone also discussed this matter with Tom Moncla. However, Tom Moncla said they were not able to figure out how to implement the guarding system on the conveyor system, belt heads and pinch points. Since they were not able to figure it out, they did not put up any guards. They allowed the taping process to continue thereafter in the same exact manner.

7

Some twenty-three (23) months later, on July 15, 2003, Melvin Rhine was the taper in the process, but on the opposite side of the pipe from which Curley Gilliam had sustained his accident on August 10, 2001. Melvin Rhine was working in the four (4') foot area designated for the taper on the backside of the pipe. In working that area, he was attempting to tape the pipe by placing the tape with his hand onto the turning pipe and then holding the roll of tape in his hand while the pipe was being taped. In doing so, somehow, the tape caught the glove of Melvin Rhine while he was taping and pulled his right hand, [and] right arm up to his head and shoulders between the pipe and the conveyor belt. (Deputy Bonnie Gunner testimony). The conveyor was subsequently stopped and reversed and Melvin Rhine was taken out of the conveyor system, but he was dead. His roll of tape was also found underneath the pipe, between the pipe and the rubber conveyor belt.

The testimony in the trial establishes that Melvin Rhine had fifteen (15) seconds to tape the first two (2') feet of the beginning of the rotating pipe and that he had a total of thirty (30) seconds for the rotating pipe to make it through the four (4') feet area that he had to tape in. It is obvious that the taping process is one that needs to be made accurately, timely and without the possibility of any miscue.

The testimony of the two (2) experts in the case, Mr. Borison and Mr. Killingsworth, establishes that guards should have been made and placed onto the conveyor system, particularly in the area of the pinch points, where Melvin Rhine was killed[,] by the initial manufacturer of the equipment and subsequently by Bayou. Both experts agree that the OSHA requirements required guarding on the conveyor system, particularly at the pinch points, such as where Melvin Rhine was killed.

Borison testified that the Curley Gilliam accident was identical to the Melvin Rhine accident and that it should well have put Bayou and its employees on notice of a hazardous and dangerous condition. He testified that Curley Gilliam was taping the rotating pipe as was required of the tapers and that similarly Melvin Rhine was taping the rotating pipe as required of the tapers. They were doing the identical task, though each from a different side of the rotating pipe. The only differences were that Curley Gilliam was caught by the tape from the taper on the opposite side of the pipe, which caused him to be dragged over the rotating pipe until his foot hit the safety trip switch and Melvin Rhine, on the other hand, somehow got his taping hand caught by tape on the pipe which pulled him into the pinch point of the rotating pipe, turning belt head and the rubber conveyor belt.

Bayou and its employees, as well as their expert, Steven Killingsworth, take the position that the accidents are not identical and that the Curley Gilliam accident did not serve to put Bayou on any notice of the danger to the tapers relative to pinch points and getting killed during the taping process.

This Court finds that their argument is ingenuous and incorrect.

8

After the Melvin Rhine accident, the cement plant was shut down. OSHA came in and made an inspection and ordered that guarding be placed throughout the system before Bayou could begin operations again. This time, however, the Bayou employees took only one (1) week to obtain necessary information and a booklet advising them as to the guarding process to be used for pipe plant. During that period of time, they discovered necessary plans for guarding the conveyor system, installed the guarding and then began operations once more. This is in stark contrast to after the Curley Gilliam accident where they were unable to figure out any manner in which to guard the conveyor system that would not hamper production. (See testimony of Boffone and Moncla). Not only did Bayou come up with guards for the entire system, but also put up guards to prohibit and prevent the tapers from leaning over and getting their hands near the pinch points and turning pipe. In addition to that, they developed a long handle for the taper to use and the roll of tape and taping was done at the other end of the long handle so that the taper could not get near the turning pipe or pinch points. A second person was then used to assist the taper and when the taper was done, he would pull the taping handle to himself and another person would actually cut the tape in an area where both were prevented from getting near the turning pipe or pinch points.

Robert Borison, the expert for plaintiffs, testified that the Curley Gilliam and Melvin Rhine accidents were similar. In fact, he testified that they were identical because the taper was caught by the turning pipe and put in a position of peril. Moncla testified that they could not come up with a guard to comply with the OSHA regulations and therefore, they continued to let the tapers tape without the appropriate guarding. Robert Borison testified that with his experience,with this type of conveyor systems in the past that the accident of Melvin Rhine was substantially certain to happen. The area subjects the workers to an accident which was substantially certain to happen to any taper, not just Melvin Rhine. The area needed to be guarded and was not. Borison further testified that the warnings given to the employees everyday at the safety meeting to keep their hands away from the turning pipe and the conveyor system and the pinch points shows the knowledge of the employer in this warning that they were certain of an accident happening to the employees at these pinch points and had no way of preventing it.

Borison also testified that the documentation of Bayou sets forth to their employee[s] that they are not allowed to work around moving pipe unless safety stop activators are used. However, the tapers were required to put their hand on the turning pipe or very close to it in order to get the tape started on the pipe as it turned. In the personnel file of each employee, Bayou tells the employee not to go around or be exposed to the turning pipe. Therefore, the own advise of Bayou tells these employees that they cannot work around a turning pipe. Therefore, Bayou was exposing their workers to an obvious hazard in telling them they can avoid the hazard by being careful. This is, of course, never adequate and is not an appropriate safety measure. Borison also advises that the guarding and the new tape pole designed and used after the Melvin Rhine accident was an appropriate way to address the problem. After Melvin Rhine's death, guards were placed on the belt heads and at the pinch points. Additionally, the taper was required to use a pole on

which the tape was attached far from his body and his body was prevented by guards from getting close to the pipe and pinch points. All of this was available to Bayou prior to the Melvin Rhine incident and certainly after the awareness of the Bayou employees after the Curley Gilliam accident.

Additionally, Borison testified that Bayou instructed their employees to stay clear of the conveyor at all times. They instructed them not to wear loose clothing when working near the conveyors. Borison testified that this is an impossible safety warning. This shows that Bayou was aware of the hazard and aware of the certainty of a disastrous accident for the tapers. Borison further testified that the requirement for the tapers to put their hands onto the pipe with the tape in order to start the tape on the turning pipe was a violation of the safety policy of Bayou as given to their own employees. Use of the tape and the manner in which it was applied was a violation of their own safety policy.

Borison also testified that the evidence of the injury, more particularly the photographs, indicated that Melvin Rhine started taping the pipe outside of the pinch point and that he got drawn into the pinch point when the tape caught on his glove and pulled his hand, arm and shoulder into the pinch point between the belt head, conveyor and turning pipe. In addition, there was no emergency safety stop that was available to Melvin Rhine as had been available to Curley Gilliam. Again, he asserts that the two (2) accidents are the same with the same risks, but that Melvin Rhine did not have the safety mechanism that was available to Curley Gilliam that saved him.

Borison testified that this accident was substantially certain to happen. There was a hazard and unless the hazard was corrected or guarded, this accident is substantially certain to happen. Additionally, the Curley Gilliam accident evidenced that the Melvin Rhine accident was substantially certain to happen. The equipment, if not guarded or redesigned is certain to have the Melvin Rhine accident. Additionally, the Bayou people knew that it was certain to happen because each day they warned their people not to put their hands near the pinch points, which the Bayou people knew were dangerous and also knew of the previous Curley Gilliam incident.

Similarly, Borison asserts that the Bayou employees were aware that OSHA's safety rules and regulations required the guarding to protect against just this type of catastrophic accident. Borison testified that it is inevitable that this accident would happen and that it definitely will happen. He can't say when it's going to happen, nor that it's going to happen every time someone tapes. However, Bayou knew that someone who experiences Melvin Rhine's position is going to get pulled into the pinch point and is going to die. Anytime someone is taping and their hands get caught on the tape and/or the pipe, they are going to get pulled into the pinch point and killed. According to Borison, Bayou deliberately did not guard this hazardous situation and they exposed Melvin Rhine to the inevitability of his death.

10

Even the expert for the defendants, Steven Killingsworth, testified that Melvin Rhine got caught in the pinch point or convergent point. This pinch point or convergent point exists to the right of where Melvin Rhine was taping in the four (4') foot area. Killingsworth testified that Melvin Rhine either over-reached or held onto the tape and was pulled into the pinch point by the turning pipe, belt head and rubber conveyor belt. Killingsworth testified that Melvin Rhine was not supposed to be taping within the belt head area. There is no testimony, however, that Melvin Rhine was taping within the belt head area. The testimony is that the tape got caught on his hand and pulled him into the pinch point or belt head area.

Again, o[f] course, Killingsworth testified that according to OSHA, the belt heads should have been guarded, as well as the pinch points. Killingsworth further testified that Bayou did not provide Melvin Rhine with a safe place to work and that was in violation of OSHA's regulations. He further testified that because Tom Moncla could not come up with a guarding system after the Curley Gilliam accident, Bayou should have hired someone to advise them and to design an appropriate guarding system rather than shaking their heads and not doing anything. Bayou was in violation of OSHA as a result. He further testified that the taping pole and dispenser should have been in place before the Melvin Rhine incident. He further testified that there was nothing in writing telling the tapers where they should tape from. He did not testify as to the substantial certainty of the accident happening or it not happening.

The Court finds that there is a preponderance of the evidence that the Bayou supervisory employees knew that the accident to Melvin Rhine and his death were substantially certain to follow from the conduct of the Bayou employees in not appropriately guarding the conveyor process, and allowing the hazardous activity to continue.

Thus, this Court finds that the Bayou employees knew from the operations which they failed to guard that the accident and death of Melvin Rhine w[ere] substantially certain to follow their failure to appropriately guard this conveyor process for Melvin Rhine and the other tapers.

This Court therefore finds that Bayou is liable to the plaintiffs herein as this accident was substantially certain to occur and thus is an exception to the Workmen's Compensation Statute. Accordingly, there will be Judgment in favor of plaintiffs and against Bayou . . . .

Based on its reasons for judgment, we find that the trial court's determination has a basis in the record. The conclusion draws not merely on the testimony of Borison but on that of Defendants' own expert and the testimony of Bayou's employees. Therefore, we find that the trial court was not manifestly erroneous in

11

finding Bayou liable for an intentional act, and we will not overturn its decision on appeal.

*Quantum of Damages*

Finally, Defendants assert that the trial court made excessive awards of damages in making identical $300,000.00 loss of consortium awards to Rhine's daughter, Ty'Nise Rhine, who lived with him and his son, Keshawn Johnson, who lived in North Louisiana with his mother and had never lived with Rhine.

The trial court explained its award as follows:

> Plaintiff, Kendra Johnson, sues on behalf of her minor child, Keyshawn Johnson. Kendra and Melvin Rhine met at ULM in August of 1996. They dated and were involved in a personal relationship from which she became pregnant. She told Melvin Rhine that she was pregnant. Melvin Rhine never denied that he was the father of the child and did not request any paternity test. She was a virgin at the time that she became pregnant for Melvin Rhine and was not involved with any other men. When that semester was over at ULM, she returned to her home in Shreveport to complete her pregnancy. After she left ULM and returned to Shreveport to complete her pregnancy, Melvin Rhine would come and visit her in Shreveport and stay at the residence with her mother. Keyshawn Johnson was born on December 19, 1997. She told Melvin Rhine about the birth. He contributed to the support of that child. Sometimes he paid cash, but most of the time, he sent money orders. He would send money orders every two (2) weeks, or at least once per month. After the child was born, Melvin Rhine would go to Shreveport and visit with the child and with Kendra Johnson. On occasion, Kendra Johnson came with her child, Keyshawn Johnson, to Jeanerette to visit with Melvin Rhine and his family. Keyshawn Johnson called the parents of Melvin Rhine his grandmother and grandfather. Melvin gave the child presents at the child's birthday, Easter and Christmas. Melvin's parents would also send presents to the child for those occasions. Melvin continued to visit with Keyshawn Johnson in Shreveport, where he lived with his mother, until the time of Melvin's death. Kendra Johnson and Melvin Rhine would discuss the child, his future, and plans for the future of the child. Kendra Johnson and Keyshawn Johnson attended the funeral for Melvin Rhine. They visited with his family, together with his parents. Kendra Johnson and Keyshawn Johnson became familiar with Tynirsha Rhine and the children that she had with Melvin Rhine. They were all extremely cordial with one another.
>
> Keyshawn Johnson took pictures from the funeral of his father and also copies of poems that were at the funeral. He keeps these items under his mattress at home so that he always has them there where he knows and he can look at them often. He knew his father from the visits his father made to him and through their talking on the telephone on numerous occasions. Keyshawn Johnson knows that his father played

12

football in college. Keyshawn was extremely sad and crying at the funeral. He does not have a role model any longer since his father has died. He does however talk on the telephone often with Melvin Rhine, III, who is the son of Melvin Rhine, from Melvin's marriage with Tynirsha Rhine. He and Melvin Rhine, III are close friends and refer to one another as brothers. Occasionally, Keyshawn Johnson still has crying spells concerning the loss of his father, whom he misses very much.

. . . .

Though they never lived together, the indication is that the association between [Keyshawn Johnson and his father] was close, continuing and valued to a great extent by Keyshawn Johnson, Keyshawn Johnson particularly has felt the loss of a male role model, his father, as indicated in his testimony and has caused him suffering since the loss of this father.

Given the evidence and testimony of record, we are unable to find an abuse of the trial court's discretion in its award of loss of consortium to Keyshawn Johnson.

## CONCLUSION

For these reasons, the judgment of the trial court is affirmed. Costs of this appeal are assessed to Defendants, the Bayou Companies, LLC and the Gray Insurance Company.

**AFFIRMED.**